**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| ALBERTO GONZALEZ FIGUEROA, JR., <br><br>                         Petitioner, <br><br> v. <br><br> WARREN L. MONTGOMERY, Warden, <br><br>                        Respondent. | Case No.: 17-cv-02572-GPC-JLB <br><br> **REPORT AND RECOMMENDATION FOR ORDER DENYING HABEAS CORPUS PETITION** <br><br><br> **[ECF No. 1]** |

## I.    INTRODUCTION

The Court submits this Report and Recommendation to United States District Judge Gonzalo P. Curiel under 28 U.S.C. § 636(b)(1) and Local Civil Rule HC.2 of the United States District Court for the Southern District of California. Petitioner Alberto Gonzalez Figueroa, Jr., a state prisoner proceeding *pro se* with a Petition for Writ of Habeas Corpus ("Petition" or "Pet.") pursuant to 28 U.S.C. § 2254, challenges his conviction for murder and torture in San Diego Superior Court Case No. SCS263789. The Court has read and considered the Petition (ECF No. 1), the Answer and Memorandum of Points and Authorities in Support of the Answer (ECF No. 14), the Traverse (ECF No. 18), the lodgments and other documents filed in this case, and the legal arguments presented by

both parties.[1]  For the reasons discussed below, the Court **RECOMMENDS** that the Petition be **DENIED**.

## II.  <u>FACTUAL BACKGROUND</u>

This Court gives deference to state court findings of fact and presumes them to be correct; Petitioner may rebut the presumption of correctness, but only by clear and convincing evidence.  *See* 28 U.S.C. § 2254(e)(1); *see also Parle v. Fraley*, 506 U.S. 20, 35–36 (1992) (holding that findings of historical fact, including inferences properly drawn from these facts, are entitled to statutory presumption of correctness).  The state appellate recounted the facts as follows:

### I. Prosecution Case

In April 2013, 35-year-old defendant lived in a two-bedroom condo unit in Chula Vista with his mother (Minerva Gonzalez Figueroa), grandfather (Leon Gonzalez), and 24-year-old younger brother (Mario Figueroa). Minerva and Leon originally moved into the unit by themselves, but were later joined by Mario, and then by defendant. Leon slept in the master bedroom; Minerva and Mario shared the other bedroom (Minerva slept on a bed, Mario on a folding bed on the floor); and defendant slept on a sofa bed in the living room.  Mario looked up to defendant, who was taller and stronger.

It was undisputed at trial that on April 2, 2013, defendant stabbed Mario to death with a samurai sword and carving fork in Mario's bedroom.  The key disputes were whether defendant had done so out of self-defense, and whether he had tortured Mario.

#### A. Three Prior Incidents

To establish motive and intent, the prosecution introduced evidence of three incidents involving defendant and Mario in December 2012 and January 2013.

On December 4, 2012, Minerva called 911 to report that she suspected defendant was on drugs and was "scaring the shit out of us."  Minerva locked Leon in his bedroom, and locked herself and Mario in theirs.  When police

---

[1] Page numbers for docketed materials cited in this Report and Recommendation refer to those imprinted by the court's electronic case filing system.

arrived, they saw through a window that defendant was holding a steak knife. When defendant noticed the police, he set down the knife and cooperated. He did not appear to the police to be under the influence. Minerva sought unsuccessfully to have the police remove defendant from the property.

Later in December, defendant and Mario argued after defendant confronted Mario for not washing his own dishes. Mario told defendant, "Let's take it outside." Even Minerva told her sons to "take it outside" so they would not fight in their home. The brothers went outside and argued more, until a neighbor who is a police officer intervened. Minerva testified defendant and Mario stopped speaking to each other because of this incident.

On January 18, 2013, defendant came home drunk, despite Minerva's prior request that he not drink alcohol while staying with her. Defendant was falling over and breaking furniture and other items. He became hostile and lunged and grabbed at Minerva, telling her to "shut up, bitch." Mario intervened nonviolently to protect Minerva. Defendant tried to retrieve a black bag in which Minerva knew he kept several kitchen knives and screwdrivers. Mario restrained defendant, wrestled him to the ground, and sat on him. Mario was having trouble restraining defendant, so he told Minerva to call 911, which she did (three times). When the police arrived, Mario was still struggling to restrain defendant and asked the officers for help. Police intervened and arrested defendant.

When defendant returned home after his arrest, he was upset with Mario and Minerva. He stopped calling Minerva "mom," and he had "absolutely no communication" with Mario. As defense counsel put it, "you could probably cut the tension with a knife . . . ." The brothers never reconciled or spoke to each other.

Minerva testified defendant told her after the January 18 incident that he was upset because "he thought that [she] was picking Mario over him." Minerva also testified that when defendant was 13 or 14 years old, she moved with Mario and her two daughters to Seattle, where they lived for about 10 years. Defendant stayed in San Diego with his father.

After the January 18 incident, Mario suggested to Minerva that they relocate his set of three samurai swords, which were on a display stand behind the television in the living room. Mario explained he did not want defendant "to have something easy to reach for" if they got into another fight. Minerva

agreed and put the swords underneath the mattress of her bed. She began to sometimes lock her bedroom door at night, and considered evicting defendant.

### B. April 2, 2013

On the morning of April 2, 2013, Minerva followed her normal routine. She woke at 6:00 a.m. and got ready for work. Before she left at about 7:00 a.m., Mario yelled out, " 'Bye mom. I love you. Have a good day.' " Minerva saw defendant – who was normally a heavy and late sleeper – lift his head and look at her from under the covers before putting the covers back over himself. Minerva did not say goodbye to defendant because they were still "upset with each other" and "were a little estranged."

A few minutes later, neighbor Veronica Mader was watching television in her condo with the doors and windows closed. She thought she heard someone screaming, but "[a]t the beginning . . . didn't pay too much attention." When she heard it again, she muted the television. This time, Mader heard someone screaming – in "a very painful voice" – " 'Help, help. Why are you doing this to me?' " She took her phone, ran outside, and yelled through the window of defendant's condo to ask if anyone needed help. She heard nothing. Mader called 911 at 7:18 a.m. She returned to her condo and quickly prepared her children for school to get them out of the complex.

Leon, who was then 87 years old and had hearing difficulties, had awakened at 7:00 a.m. to take medicine and was resting in his bed when he heard Mario screaming for help. Mario sounded scared; Leon had never heard him scream like that before. Leon got up, went to Mario's bedroom, opened the door, and saw defendant on top of Mario with his knee on Mario's chest. Leon placed a hand on defendant's shoulder, and Mario looked at him and pleaded, "Help me, grandfather." Leon saw defendant striking Mario's head and face with his right hand, but could not see if defendant had any weapons. Leon never saw Mario hit defendant or hold any weapons. Leon told defendant to leave Mario alone. Defendant told Leon, "There is nothing going on," and made a hand gesture for Leon to leave. Leon left the room. Defendant never asked Leon for help.

Leon went to the bathroom, then tried to call the police on his cell phone but was having trouble seeing the numbers. Before Leon could call, he encountered defendant in the hallway. Defendant asked Leon what he was doing with the phone. When Leon said he was going to call the police, defendant took the phone from him, opened the door to Mario's bedroom, and

threw the phone into the room. Defendant seemed calm to Leon. Leon pointed out to defendant that defendant had blood on his shorts; defendant did not respond. Leon told defendant he was going to go outside to get some fresh air, but he really intended to have a neighbor call the police. A neighbor called 911 for Leon at 7:24 a.m.

About five minutes after she called 911, neighbor Mader was heading to her car to take her children to school when she observed defendant in the open doorway of his condo getting a bag out of a closet. She asked defendant if he was okay. He "very calm[ly]" replied, "Yeah. I'm fine. I'm fine." Mader told defendant she had called 911 because she thought something was wrong. Defendant did not respond, but as Mader was backing her car out, she saw defendant leaving in a rush – so much so that he ran in front of her car and she had to apply the brakes. Defendant never asked Mader for help.

Another neighbor, Darnella Hosch, was walking her dog in the condo complex when she saw defendant riding a bicycle and wearing a backpack. When Hosch said "good morning" to defendant, he seemed "very nervous" and almost fell off his bicycle. Hosch noticed blood on defendant's leg as he was "racing past" her. Defendant did not ask Hosch for help.

Chula Vista police officers responding to the 911 calls entered the family's condo and found Mario unresponsive and covered in blood. The officers notified dispatch, who sent paramedics to the scene. Paramedics pronounced Mario dead at the scene at 7:42 a.m.

Chula Vista dispatchers broadcasted that there had been a murder and identified defendant as the suspect. As dispatchers were describing defendant, he rode by a National City police officer about eight miles from the crime scene. The officer detained defendant at gunpoint. Defendant had blood on his shoes, calf, shorts, hands, arms, cheek, and head. There was also fecal matter on defendant's shorts. Defendant had a small wound on a knuckle on his right hand, an injury to the middle knuckle of his left ring finger, and an injury on his chest and left shoulder. His backpack contained two screwdrivers, a knife, and a glove, none of which had blood on them.

///

///

///

///

5

## C. Crime Scene Evidence

Investigators found no signs of struggle anywhere in the family's condo. Behind the closed door of Mario's bedroom, they observed Mario's body, covered in blood, face-up atop bedding, on the floor. One of Mario's legs was still partially beneath his bedding.

Under the bedding, investigators found a carving fork and samurai sword. There was blood on the carving fork, and its tines were bent. The sword was "covered in" blood, and its blade was bent.

Mario's blood had pooled under his body and soaked through the bedding, a rug, the carpet, and the carpet pad, ending up on the concrete subfloor. The sword had stabbed through the bedding and carpeting and chipped the subfloor. There were droplets of blood throughout the room. Investigators found two samurai swords and one sheath between the mattress and box spring of Minerva's bed.

Elsewhere in the family's condo, investigators found a pair of shorts in the washing machine with blood and fecal matter on them. They also found a glove with blood on it on the kitchen counter.

Mario's DNA matched blood samples taken from the fork, the sword, the glove, the bedroom walls, and defendant's leg.

## D. Medical Evidence

Glenn Wagner, M.D., the Chief Medical Examiner of San Diego County, conducted the autopsy on Mario. He had previously conducted about 14,000 autopsies. In addition to extensive bruising to Mario's face and scalp, Dr. Wagner observed that Mario suffered 38 wounds that were consistent with having been inflicted by the carving fork and samurai sword. [FN 3: Dr. Wagner clarified that this total was not indicative of the total number of blows "[b]ecause you got fork injuries – so it's half of that – and at least two of the chest wounds are through and through . . . ."]

Mario had 12 puncture wounds – consistent with having been inflicted by the carving fork – on his neck, face, shoulder, and back. Dr. Wagner stated none of these wounds were "particularly deep" or life-threatening, but would "[h]urt, probably, for sure."

///

Mario suffered 10 incised wounds (lacerations longer than they are deep) under his chin, and on his cheeks, ear, scalp, and forearm. Dr. Wagner indicated many of these wounds appeared to have been inflicted when Mario was defending himself or moving.

Mario also suffered 16 stab wounds (wounds deeper than they are long), five of which would independently have been fatal. The stab wounds punctured both of Mario's lungs; cut his heart and aorta; and damaged his trachea, esophagus, spleen, and one kidney.

Regarding sequence, Dr. Wagner opined Mario first suffered blunt force injuries to his head and face, then puncture wounds inflicted by the carving fork, then the incised wounds, then the stab wounds. Dr. Wagner further opined Mario's earlier injuries were inflicted while he was face-down, and the later injuries were inflicted after he turned face-up. Dr. Wagner opined they were all inflicted while Mario was alive, and that they would have caused "pretty extreme pain." Dr. Wagner determined Mario bled to death over the course of about 10 to 20 minutes.

Dr. Wagner also testified about defendant's injuries. He opined the injuries to defendant's hands were consistent with defendant punching something, and holding a knife that slipped. The wounds on defendant's chest were superficial.

## II. Defense Case

Defendant testified as the only defense witness. He admitted killing Mario, but claimed it was in self-defense.

### A. Three Prior Incidents

Defendant addressed and downplayed the significance of the December 2012 and January 2013 incidents. Defendant surmised his mother called police during the December 4 incident because he had his music or the television too loud. He explained he was holding a knife when police arrived because he was cutting steak.

Regarding the second December incident, defendant initially testified he politely asked Mario to clean up after himself, but later acknowledged he might have said, " [']Why don't you clean your shit up, man.' " Mario became

defensive and challenged defendant to a fight. Defendant admitted "there was kind of a distance" between him and Mario after that incident.

Defendant admitted he came home drunk on January 18, 2013, but stated he apologized to Minerva and reconciled with her. Defendant and Mario, however, never had another conversation with each other and kept their distance. Defendant acknowledged he felt like he "was treated like just somebody that wasn't part of the family." He described Mario as the "little enforcer" who was "just creeping over [defendant's] shoulder 24/7." Defendant said he and Mario had no altercations between January 18 and April 2.

## B. April 2, 2013

Defendant woke to the sound of Minerva and Mario's voices on April 2. He saw Minerva leave for work, but stayed in bed to decide what kind of exercise he would do. He got up, made up the sofa bed and folded it away, put on his shoes and shorts (but no shirt), and headed toward the bathroom. As defendant walked quickly down the hall, he and Mario unexpectedly and "rough[ly]" bumped into each other. The collision was followed by an immediate, "heated," expletive-laden exchange. Defendant continued on to the bathroom, where he resolved to avoid any further confrontation with Mario.

Defendant decided to start a load of laundry before leaving to work out. Some of Minerva's sheets were in the dryer, so defendant was going to take them into her and Mario's room. He went to the room to open the door without the laundry because it would be too hard to open the door if his hands were full.

When defendant opened the bedroom door, Mario was standing with his back to him. Mario appeared startled, jumped around, and yelled, "What the fuck, motherfucker. I thought I fucking told you . . . ." As Mario turned, defendant saw that he was holding a carving fork in one hand and a samurai sword in the other. [FN 4: Defendant testified that although he grilled food on the barbeque "almost every day," he had never seen this particular carving fork before. He also testified he knew Mario had samurai swords, but claimed to have never seen the set of three that had previously been stored in the living room where defendant slept.] Defendant "just went blank from there" and "tuned everything out." Mario swung the carving fork and hit defendant's hand. Defendant closed his eyes, went straight toward Mario, and started

8

punching. Defendant said he was "shocked" and "scared shitless," literally – he defecated in his shorts.

Defendant's hands struck Mario and the men got tangled up in Mario's bedding and fell to the floor. Defendant's mind "went blank" as he felt he was "fighting for [his] life." He felt a pain or rush in his body and thought he had been stabbed. He "couldn't focus on anything." Defendant testified he blanked out and could not recall the details of the attack, but claimed he was in fear for his life every time he stabbed Mario. He claimed he did not hear Mario screaming for help.

Defendant said he "came back to [his] senses" when Leon entered the room as defendant and Mario were fighting over the fork. Defendant was worried Leon would trip and fall, so defendant said in Spanish, "No, no, grandpa. Everything is okay. Don't you worry." Leon pointed out that defendant had blood on his shorts. Defendant then saw Mario was coughing up blood and moving his hand near a knife and some screwdrivers under Minerva's bed, so defendant picked up those items.

After Leon left the room, defendant left as well to make sure Leon was okay. He saw Leon trying to make a phone call and took the phone to help him. When the "phone wasn't working or anything," defendant opened the door to Mario's bedroom and threw the phone inside the room. Defendant admitted he did not know why he did that. When defendant opened the door, he could only see the lower part of Mario's body, which "was just laying there."

Defendant testified he put the knife and screwdrivers in his backpack because he was thinking, " 'I better hold onto these because what if [Mario] runs out of the room and attacks me again.' " However, defendant admitted he did not remove the carving fork or samurai sword from the bedroom. Defendant changed his shorts (because they had blood and feces on them) and rode off on his bike to look for Leon because he was concerned for Leon's safety.

Defendant acknowledged he must have inflicted all of Mario's wounds, but said he was merely defending himself. Defendant said he did not recall how he inflicted each injury because he was in shock when it happened. Defendant admitted he never went back to check on Mario or summoned help for him.

///

Defendant testified the wound on one of his knuckles was from the fight with Mario. He acknowledged that, despite being in a fight for his life, he had hardly any injuries.

### III. Rebuttal

As its sole rebuttal witness, the prosecution called a police detective who was present when defendant was being processed for evidence. The detective testified that when defendant was asked how he received the injury on one of his hands, defendant said it happened when he fell off his bike.

(Lodgment No. 6, ECF No. 15-13 at 2–13.)

## III.    **PROCEDURAL BACKGROUND**

On November 20, 3013, the San Diego County District Attorney's Office filed an Information charging Alberto Gonzalez Figueroa, Jr. with one count of murder, a violation of California Penal Code (Penal Code) § 187(a) (count one), one count of torture, a violation of Penal Code § 206 (count two), one count of assault with a deadly weapon, a violation of Penal Code § 254(a)(1) (count three), and one count of possession of a deadly weapon at a penal institution, a violation of Penal Code § 4502(a) (count four). (Lodgment No. 1, ECF No. 15-1 at 15–17.) As to counts one and two, the Information also contained two allegations that Figueroa personally used a deadly and dangerous weapon, within the meaning of Penal Code § 12022(b)(1). (*Id.* at 16.) The Information also alleged that Figueroa personally used a deadly and dangerous weapon, within the meaning of Penal Code § 1192.7(c)(23). (*Id.*) Finally, the Information alleged Figueroa had suffered two prior convictions for which he had served a prison sentence, within the meaning of Penal Code § 667.5(b) and 668. (*Id.* at 17.) Following a jury trial, Figueroa was convicted of counts one and two. (*Id.* at 232–33.) He pleaded guilty to count three and count four was dismissed. (Lodgment No. 2, ECF No. 15-16 at 11–13, 16–17.) He was sentenced to a prison term of twenty-five years-to-life plus six years, for a total term of thirty-one years-to-life in prison. (*Id.* at 23–31.)

Figueroa appealed his conviction to the California Court of Appeal for the Fourth Appellate District. (Lodgment Nos. 4–5, ECF Nos. 15-11, 15-12.) The state appellate

court upheld Figueroa's conviction in a written, unpublished opinion. (Lodgment No. 6, ECF No. 15-13.) Figueroa then filed a petition for review in the California Supreme Court, which denied the petition without citation of authority. (Lodgment Nos. 7–8, ECF Nos. 15-14, 15-15.)

Figueroa filed a Petition for Writ of Habeas Corpus in this Court on December 26, 2017. (ECF No. 1.) The Petition contained an unexhausted claim which this Court recommended be dismissed in a Report and Recommendation filed April 2, 2018. (ECF No. 11.) Thereafter, Respondent filed an Answer on June 11, 2018. (ECF No. 14.) Figueroa filed a Traverse on June 29, 2018. (ECF No. 18.)

## IV.   DISCUSSION

In claims one and three, Figueroa contends his due process rights were violated when the trial court improperly instructed the jury. (Pet., ECF No. 1 at 6, 8.) In claim two, Figueroa argues there was insufficient evidence to support his conviction for torture. (*Id.* at 7.) Respondent argues the state court's resolution of Figueroa's claims was neither contrary to, nor an unreasonable application of, clearly established Supreme Court law. (Answer, ECF No. 14.) Respondent also contends Figueroa is not entitled to an evidentiary hearing. (*Id.* at 22–23.)

## A.   Standard of Review

This Petition is governed by the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). *See Lindh v. Murphy*, 521 U.S. 320 (1997). Under AEDPA, a habeas petition will not be granted with respect to any claim adjudicated on the merits by the state court unless that adjudication: (1) resulted in a decision that was contrary to, or involved an unreasonable application of clearly established federal law; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented at the state court proceeding. 28 U.S.C. § 2254(d); *Early v. Packer*, 537 U.S. 3, 8 (2002). In deciding a state prisoner's habeas petition, a federal court is not called upon to decide whether it agrees with the state court's determination; rather, the court applies an extraordinarily deferential review, inquiring only whether the state

court's decision was objectively unreasonable.  *See Yarborough v. Gentry*, 540 U.S. 1, 4 (2003); *Medina v. Hornung*, 386 F.3d 872, 877 (9th Cir. 2004).

A federal habeas court may grant relief under the "contrary to" clause if the state court applied a rule different from the governing law set forth in Supreme Court cases, or if it decided a case differently than the Supreme Court on a set of materially indistinguishable facts.  *See Bell v. Cone*, 535 U.S. 685, 694 (2002).  The court may grant relief under the "unreasonable application" clause if the state court correctly identified the governing legal principle from Supreme Court decisions but unreasonably applied those decisions to the facts of a particular case.  *Id.*  Additionally, the "unreasonable application" clause requires that the state court decision be more than incorrect or erroneous; to warrant habeas relief, the state court's application of clearly established federal law must be "objectively unreasonable."  *See Lockyer v. Andrade*, 538 U.S. 63, 75 (2003).  The Court may also grant relief if the state court's decision was based on an unreasonable determination of the facts.  28 U.S.C. § 2254(d)(2).

Where there is no reasoned decision from the state's highest court, the Court "looks through" to the last reasoned state court decision and presumes it provides the basis for the higher court's denial of a claim or claims.  *See Ylst v. Nunnemaker*, 501 U.S. 797, 805–06 (1991).  If the dispositive state court order does not "furnish a basis for its reasoning," federal habeas courts must conduct an independent review of the record to determine whether the state court's decision is contrary to, or an unreasonable application of, clearly established Supreme Court law.  *See Delgado v. Lewis*, 223 F.3d 976, 982 (9th Cir. 2000), *overruled on other grounds by Andrade*, 538 U.S. at 75–76; *accord Himes v. Thompson*, 336 F.3d 848, 853 (9th Cir. 2003).  Clearly established federal law, for purposes of § 2254(d), means "the governing principle or principles set forth by the Supreme Court at the time the state court renders its decision."  *Andrade*, 538 U.S. at 72.

**B.  Analysis**

Figueroa argues that the trial court violated his due process rights when it refused to instruct the jury regarding a killing committed in the heat of passion, which would have

negated the malice element of homicide and/or the premeditation and deliberation element of first degree murder. Had the jury been properly instructed, Figueroa argues, the jury could have convicted him of voluntary manslaughter or second degree murder instead of first degree murder. (Pet., ECF No. 1 at 6, 8.) Figueroa also contends there was insufficient evidence to support his conviction for torture. (*Id.* at 7.)

      1.   <u>Jury Instruction Error (Claims One and Three)</u>

During the jury instruction conference, defense counsel asked the trial court to instruct the jury with CALCRIM Nos. 522, which defines provocation and which reduces a killing from first degree to second degree murder, and 570, which defines the crime of voluntary manslaughter committed in the heat of passion, a lesser-included offense to murder. (Lodgment No. 2, ECF No. 15-7 at 1168.) The trial judge declined to instruct the jury as requested, concluding there was insufficient evidence to support the instructions. (*Id.* at 1170.)

Figueroa claimed in his appeal filed in the California Court of Appeal for the Fourth Appellate District and in his petition for review filed in the California Supreme Court that the refusal to give the instructions was a constitutional error that prejudicially violated his due process rights. (Lodgment Nos. 4, 7, ECF Nos. 15-11, 15-14.) The California Supreme Court denied the petition for review without citation of authority. (Lodgment No. 8, ECF No. 15-15.) The state appellate court concluded that the failure to give the instructions was constitutional error, but that the error was not prejudicial. (Lodgment No. 6, ECF No. 15-13.) Applying the standard outlined in *Chapman v. California*, 386 U.S. 18, 24 (1967), which requires a court to determine whether the error is harmless beyond a reasonable doubt, the court wrote:

> Under the *Chapman* standard, we find the instructional error was not prejudicial. " 'In determining whether error has been committed in giving or not giving instructions, we must consider the instructions as a whole [and] assume that the jurors are intelligent persons and capable of understanding and correlating all jury instructions which are given.' " (*People v. Yoder* (1979) 100 Cal.App.3d 333, 338.) Error in failing to instruct the jury "is harmless when the jury necessarily decides the factual questions posed by the

omitted instructions adversely to [the] defendant under other properly given instructions." (*People v. Lewis* (2001) 25 Cal.4th 610, 646.) "In addition, closing arguments to the jury are relevant in evaluating prejudice." (*People v. Chavez* (2004) 118 Cal.App.4th 379, 388.)

The jury was instructed with CALCRIM No. 505 regarding complete self-defense [footnote omitted], and CALCRIM No. 571 regarding imperfect self-defense. [footnote omitted] The jury also heard defendant's extensive trial testimony in support of these defenses and had the opportunity to evaluate his credibility. By rejecting these defenses and finding defendant guilty of first degree murder, the jury necessarily disbelieved defendant's version of events. Otherwise, the jury would have convicted defendant, *at most*, of voluntary manslaughter on an imperfect self-defense theory.

This conclusion is further supported by the fact the jury found defendant guilty of first degree murder, which the jury was instructed required a finding that defendant killed Mario with premeditation and deliberation. [footnote omitted] CALCRIM No. 521 specifically provides that "[a] decision to kill made rashly, impulsively, or without careful consideration is not deliberate and premeditated." By finding that defendant premeditated and deliberated Mario's death, the jury necessarily concluded he did not act rashly or impulsively in the heat of passion. (*People v. Wharton* (1991) 53 Cal.3d 522, 571 ["By finding defendant was guilty of first degree murder, the jury necessarily found defendant premeditated and deliberated the killing. This state of mind, involving planning and deliberate action, is manifestly inconsistent with having acted under the heat of passion…and clearly demonstrates that defendant was not prejudiced by the failure to give his requested instruction."].)

In addressing CALCRIM No. 521 in closing argument, the prosecutor noted the instruction is inconsistent with heat of passion: "It just matters whether the killing is deliberate and premeditated. The amount of time may vary from person to person, how long they think about it and premeditate. *If it's made rashly or impulsively, right? We are talking a like a heat-of-passion-type thing. Then maybe that's not deliberate and premeditated.*" (Italics added.) This statement minimized any potential prejudice.

In light of the record, the jury instructions, the jury's verdict, and the arguments of counsel, we conclude the trial court's failure to instruct the jury regarding heat of passion voluntary manslaughter was harmless beyond a reasonable doubt.

17-cv-02572-GPC-JLB

### D. Second Degree Murder

Having determined that defendant presented substantial evidence of provocation for purposes of heat of passion voluntary manslaughter, we conclude he was also entitled to an instruction regarding provocation to negate premeditation and deliberation for purposes of allowing the jury to find second degree murder. (*People v. Padilla* (2002) 103 Cal.App.4th 675, 678 [provocation for purposes of reducing murder from first degree to second degree bears only a subjective component].) However, for the same reasons just discussed, we conclude the error caused defendant no prejudice.

(Lodgment No. 6, ECF No. 15-13 at 24–27.)

When an error of federal constitutional magnitude occurs at trial, a reviewing court on direct appeal must determine whether, considering the trial record as a whole, the error was harmless beyond a reasonable doubt. *Chapman v. California*, 386 U.S. 18, 24 (1967); *Dixon v. Williams*, 750 F.3d 1027, 1036 (9th Cir. 2014). When a petitioner challenges a state court's determination under *Chapman* on federal habeas corpus review, a federal court must review the state court's harmlessness determination under AEDPA's standard:

When a *Chapman* decision is reviewed under AEDPA, "a federal court may not award habeas relief under § 2254 unless *the harmlessness determination itself* was unreasonable." And a state-court decision is not unreasonable if "'fairminded jurists could disagree' on its correctness." [A petitioner] therefore must show that the state court's decision to reject his claim "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility of fairminded disagreement."

*Davis v. Ayala*, 135 S. Ct. 2187, 2199 (2015) (citations omitted) (first quoting *Fry v. Pliler*, 551 U.S. 112, 119 (2007); then quoting *Harrington v. Richter*, 562 U.S. 86, 101 (2011); and then quoting *Richter*, 562 U.S. at 103).

Figueroa's defense to the charges was that he acted in self-defense. (Lodgment No. 2, ECF No. 15-9 at 95.) Figueroa testified that his relationship with his brother Mario had become tense and distant after a January 18, 2013 incident when Mario restrained him when he was drunk and called police. (Lodgment No. 2, ECF No. 15-7 at 85.) The day of the murder, Figueroa testified, he bumped into Mario in the hall and the two exchanged

words.  (*Id.* at 105.)  Figueroa testified that when he opened the master bedroom where Mario slept to put some clean laundry on the bed a short while later, Mario, who was in the room, turned and confronted him with a barbecue fork and sword in his hands.  (*Id.* at 111.)  At that point, according to Figueroa, Mario began screaming at him and advanced on him with the weapons.  (*Id.* at 112.)  Figueroa testified he "went blank from there," that he "just like – tuned everything out" and then "closed [his] eyes and when straight towards [Mario]."  (*Id.*)  The two began to struggle, falling to the ground.  (*Id.* at 115.)  Figueroa claimed he was "fighting for [his] life at [that] point" but that he "[didn't] remember every last little detail."  (*Id.*)  Figueroa also testified that he and Mario struggled for control of the sword, and though he admitted he "poked" Mario with the sword, he could not remember the details of how many times he stabbed Mario but reiterated that "there was a struggle for [the weapons] and I feel I did get the best of him."  (*Id.* at 122–23.)

Defense counsel asked the trial court judge to give instructions on both justifiable homicide (self-defense) and voluntary manslaughter (imperfect self-defense).  (Lodgment No. 1, ECF No. 15-1 at 197–99.)  The court agreed to do so.  The justifiable homicide instruction read as follows:

> The defendant is not guilty of murder or manslaughter if he was justified in killing someone in self-defense.  The defendant acted in lawful self-defense if:
>
> 1.  The defendant reasonably believed that he was in imminent danger of being killed or suffering great bodily injury;
>
> 2.  The defendant reasonably believed that the immediate use of deadly force was necessary to defend against danger;
>
> AND
>
> 3.  The defendant used no more force than was reasonably necessary to defend against the danger.
>
> Belief in future harm is not sufficient, no matter how great or how likely the harm is believed to be.  The defendant must have believed there was imminent

17-cv-02572-GPC-JLB

danger of death or great bodily injury to himself. Defendant's belief must have been reasonable and he must have acted only because of that belief. The defendant is only entitled to use that amount of force that a reasonable person would believe is necessary in the same situation. If the defendant used more force than was reasonable, the killing was not justified.

When deciding whether the defendant's beliefs were reasonable, consider all the circumstances as they were known to and appeared to the defendant and consider what a reasonable person in a similar situation with similar knowledge would have believed. If the defendant's beliefs were reasonable, the danger does not need to have actually existed.

A defendant is not required to retreat. He or she is entitled to stand his or her ground and defend himself or herself and, if reasonably necessary, to pursue an assailant until the danger of death or great bodily injury has passed. This is so even if safety could have been achieved by retreating,

*Great bodily injury* means significant or substantial physical injury. It is an injury that is greater than minor or moderate harm.

The People have the burden of proving beyond a reasonable doubt that the killing was not justified. If the People have not met this burden, you must find the defendant not guilty of murder or manslaughter.

(*Id.* at 197–98 [CALCRIM No. 505].)

The voluntary manslaughter (imperfect self-defense) instruction, which is a lesser included offense to murder, read as follows:

A killing that would otherwise be murder is reduced to voluntary manslaughter if the defendant killed a person because he acted in imperfect self-defense.

If you conclude the defense acted in complete self-defense, his action was lawful and you must find him not guilty of any crime. The difference between complete self-defense and imperfect self-defense depends on whether the defendant's belief in the need to use deadly force was reasonable.

///
///
///

The defendant acted in imperfect self-defense if:

> 1. The defendant actually believed that he was in imminent danger of being killed or suffering great bodily injury;
>
> AND
>
> 2. The defendant actually believed that the immediate use of deadly force was necessary to defend against the danger;
>
> BUT
>
> 3. At least one of those beliefs was unreasonable.

Belief in future harm is not sufficient, no matter how great or how likely the harm is believed to be.

In evaluating the defendant's beliefs, consider all the circumstances as they were known and appeared to the defendant.

The People have the burden of proving beyond a reasonable doubt that the defendant was not acting in imperfect self-defense. If the People have not met this burden, you must find the defendant not guilty of murder.

(*Id.* at 199 [CALCRIM No. 571].)

In addition to requesting self-defense and imperfect self-defense instructions, which the trial court agreed to give, defense counsel proposed jury instructions regarding the lesser included offense of voluntary manslaughter committed in the heat passion and provocation. Those instructions read as follows:

A killing that would otherwise be murder is reduced to voluntary manslaughter if the defendant killed someone because of a sudden quarrel or in the heat of passion.

The defendant killed someone because of a sudden quarrel or heat of passion if:

> 1. The defendant was provoked;
>
> 2. As a result of the provocation, the defendant acted rashly and

18

under the influence of intense emotion that obscured his/her reasoning or judgment;

AND

3. The provocation would have caused a reasonable person of average disposition to act rashly and without due deliberation, that is, from passion rather than judgment.

Heat of passion does not require anger, rage, or any specific emotion. It can be any violent or intense emotion that causes a person to act without due deliberation and reflection.

In order for heat of passion to reduce a murder to voluntary manslaughter, the defendant must have acted under the direct and immediate influence of provocation as I have defined it. While no specific type of provocation is required, slight or remote provocation is not sufficient. Sufficient provocation may occur over a short or long period of time.

It is not enough that the defendant simply was provoked. The defendant is not allowed to set up his/her own standard of conduct. You must decide whether the defendant was provoked and whether the provocation was sufficient. In deciding whether the provocation was sufficient, consider whether a person of average disposition, in the same situation and knowing the same facts, would have reacted from passion rather than judgment.

[If enough time passed between the provocation and the killing for a person of average disposition to "cool off" and regain his or her clear reasoning and judgment, then the killing is not reduced to voluntary manslaughter on this basis.]

The People have the burden of proving beyond a reasonable doubt that the defendant did not kill as the result of a sudden quarrel or in the heat of passion. If the People have not met this burden, you must find the defendant not guilty of murder.

. . . .

Provocation may reduce a murder from first degree to second degree [and may reduce a murder to manslaughter]. The weight and significance of the provocation, if any, are for you to decide.

If you conclude that the defendant committed murder but was provoked, consider the provocation in deciding whether the crime was first or second degree murder. [Also, consider the provocation in deciding whether the defendant committed murder or manslaughter.]

[Provocation does not apply to a prosecution under a theory of felony murder.]

(*Id.* at 151–52 [CALCRIM No. 570 and 522].)

Defense counsel told the trial court judge the heat of passion and provocation instructions were appropriate because Figueroa's testimony established a possible provocation defense:

MR. ROUSTON: I believe my client, when he testified – is that when he entered the room, first, he thought he startled his brother. His back was towards him. But then when his brother, Mario, turned around, he, Mario, said some profanities at my client and then swung what I believe to be the fork at my client, and at that point, essentially, the fight began.

And, obviously, it was a very violent fight that pursued [sic], and I think that – I understand that the self-defense instruction, that applies, and then imperfect self-defense, but I don't think they are mutually exclusive. I don't think that we can say that, "Oh. Well, you have imperfect self-defense and self-defense, so voluntary manslaughter doesn't apply." I think that the jury could feel that this was a sudden quarrel that happened, and that my client acted because of that provocation with the knife, and acted rationally under the influence of intense emotion that he was feeling at that time, which happened to be fear, which goes to our self-defense. But it's still an intense emotion that he's feeling, that made him act the way he did without due deliberation.

So based on that, your Honor, based on what I believe the testimony was, I'm asking for that CALCRIM instruction 570. And of course, if that is given, then 522, "Provocation," the effect on the degree of murder, would also have to be given in conjunction with that.

(Lodgment No. 2, ECF No. 15-8 at 13–14.)

As defense counsel's argument illustrates, the facts that would have led a jury to conclude Figueroa was "provoked" are the same as those which would have formed the basis of the defense of justifiable homicide or voluntary manslaughter/imperfect self-

20

defense. As the state court noted, however, if the jury believed Figueroa's testimony about the events leading up to Mario's death, they would have either acquitted him under the justifiable homicide/self-defense instructions or they would have convicted him of voluntary manslaughter under an imperfect self-defense theory. In addition, the instructions for justifiable homicide and voluntary manslaughter/imperfect self-defense told the jury that it was the People's burden to prove that Figueroa did not commit a justifiable homicide or kill Mario with an actual but unreasonable belief in the need to defend himself. (Lodgment No. 1, ECF No. 15-1 at 197–99.) The jury's rejection of those defenses means they did not believe Figueroa's version of events and believed the prosecution had proved beyond a reasonable doubt that Figueroa did not commit a justifiable homicide or kill Mario with an actual but unreasonable belief in the need to defend himself. Given this, the state appellate court reasonably determined that the jury would not have concluded Figueroa killed Mario "because of a sudden quarrel or heat of passion" had that instruction been given and that the instructional error was therefore harmless beyond a reasonable doubt. (*Id.* at 151–52 [CALCRIM No. 570].)

In addition, the first degree murder instructions told the jury that "[a] decision to kill made rashly, impulsively or without careful consideration is not deliberate and premeditated." (*Id.* at 194.) The instructions further informed the jury that "The People have the burden of proving beyond a reasonable doubt that the killing was first degree murder rather than a lesser crime," and that "[i]f the People have not met this burden, you must find the defendant not guilty of first degree murder and the murder is second degree murder." (*Id.* at 195.) In order for the jury to have convicted Figueroa of first degree murder, they had to conclude beyond a reasonable doubt that Figueroa did not decide to kill Mario "rashly, impulsively or without careful consideration," but rather that he "carefully weighed the considerations for and against his choice and, knowing the consequences, decided to kill . . . ." (*Id.* at 194.) Given the jury's conclusions, the state appellate court reasonably concluded that the jury would not have found Figueroa guilty of voluntary manslaughter/heat of passion or second degree murder if they had been

properly instructed and that the instructional error was therefore harmless beyond a reasonable doubt. (*Id.* at 151.)

For the foregoing reasons, the state court's denial of this claim was neither contrary to, nor an unreasonable application of, clearly established Supreme Court law. *See Yarborough*, 540 U.S. at 4. Nor was it based on an unreasonable determination of the facts. *See* 28 U.S.C. § 2254(d)(2). Figueroa is not entitled to relief as to this claim.

## 2. Sufficiency of the Evidence of Torture (Claim Two)

Figueroa also argues there was insufficient evidence presented to support his conviction for torture. (Pet., ECF No. 1 at 7.) The Due Process Clause of the Constitution guarantees defendants the right to be convicted only upon proof of every element of a crime beyond a reasonable doubt. *Juan H. v. Allen*, 408 F.3d 1262, 1274 (9th Cir. 2005) (citing *In re Winship*, 397 U.S. 358, 364 (1970)). On federal habeas corpus review of a conviction on sufficiency of evidence grounds, however, a petitioner "faces a heavy burden" to establish a due process violation. *Id.* The Ninth Circuit has described a petitioner's burden as follows:

> First, he must meet the burden under *Jackson v. Virginia* of showing that "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Second, after the passage of the Antiterrorism and Effective Death Penalty Act of 1996, the standards of *Jackson* are applied "with an additional layer of deference," requiring the federal court to determine "whether the decision of the state court reflected an 'unreasonable application of' *Jackson* to the facts of this case."

*Maquiz v. Hedgpeth*, 907 F.3d 1212, 1217 (9th Cir. 2018) (citations omitted) (first quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (Stevens, J., concurring); and then quoting *Juan H.*, 408 F.3d at 1274–75). A federal habeas court must be "mindful of 'the deference owed to the trier of fact and, correspondingly, the sharply limited nature of constitutional sufficiency review.'" *Juan H.*, 408 F.3d at 1274 (quoting *Wright v. West*, 505 U.S. 277, 296–97 (1992)). Deference under AEDPA, however, "does not imply abandonment or

17-cv-02572-GPC-JLB

abdication of judicial review." *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

Although circumstantial evidence can be sufficient to support a conviction, "[s]peculation and conjecture cannot take the place of reasonable inferences and evidence . . . ." *Maquiz*, 907 F.3d at 1217 (quoting *Juan H.*, 408 F.3d at 1279); *accord United States v. Lewis*, 787 F.2d 1318, 1323 (9th Cir. 2000) ("[M]ere suspicion or speculation cannot be the basis for creation of logical inferences.").

In determining whether sufficient evidence has been presented, the court refers to the elements of the crime as defined by state law. *See Juan H.*, 408 F.3d at 1276; *Jackson*, 443 U.S. at 324 n.16. The crime of torture has been defined by California courts as follows:

> Penal Code section 206 states: "Every person who, with the intent to cause cruel or extreme pain and suffering for the purpose of revenge, extortion, persuasion, or for any sadistic purpose, inflicts great bodily injury as defined in Section 12022.7 upon the person of another, is guilty of torture. [¶] The crime of torture does not require any proof that the victim suffered pain." (Further section references are to the Penal Code unless otherwise specified.)
>
> Thus, for purposes of section 206, torture has two elements: (1) the infliction of great bodily injury; and (2) the specific intent to cause cruel or extreme pain and suffering for the purpose of revenge, extortion, persuasion, or for any sadistic purpose. (*People v. Baker* (2002) 98 Cal.App.4th 1217, 1223, 120 Cal.Rptr.2d 313.) Torture focuses upon the mental state of the perpetrator. (*People v. Hale* (1999) 75 Cal.App.4th 94, 108, 88 Cal.Rptr.2d 904.) In this respect, revenge, extortion, and persuasion are self-explanatory. Sadistic purpose encompasses the common meaning, " 'the infliction of pain on another person for the purpose of experiencing pleasure.' " (*People v. Aguilar* (1997) 58 Cal.App.4th 1196, 1203, 68 Cal.Rptr.2d 619.) While sadistic pleasure is often sexual, the statute does not require a sexual element. (Ibid.)
>
> Torture does not require the defendant act with premeditation and deliberation, and it does not require that he intend to inflict prolonged pain. (*People v. Hale*, *supra*, 75 Cal.App.4th at p. 107, 88 Cal.Rptr.2d 904.) Accordingly, the length of time over which the offense occurred is relevant but not necessarily determinative. (*Id.* at pp. 107–108, 88 Cal.Rptr.2d 904.) Likewise, the severity of the wounds inflicted is relevant but not necessarily

determinative. (*People v. Pre* (2004) 117 Cal.App.4th 413, 420–421, 11 Cal.Rptr.3d 739.)

*People v. Massie*, 142 Cal. App. 4th 365, 370 (2006).

Figueroa raised this claim in the petition for review he filed in the California Supreme Court on direct review. (Lodgment No. 7, ECF No. 15-14.) The state supreme court denied the petition without citation of authority. (Lodgment No. 8, ECF No. 15-15.) Accordingly, this Court must "look through" to the state appellate court's opinion denying the claim as the basis for its analysis. That court wrote:

> Viewing the record in the light most favorable to the judgment (*Harris*, *supra*, 57 Cal.4th at p. 849), we conclude substantial evidence supports defendant's torture conviction. There is little question defendant inflicted great bodily injury on Mario. (See, *Hale*, *supra*, 75 Cal.App.4th at p. 108 ["'Abrasions, lacerations and bruising can constitute great bodily injury.'"].) Defendant inflicted bruises, 12 puncture wounds, 10 incised wounds, and 16 stab wounds. The stab wounds injury many of Mario's vital organs. Thus, substantial evidence supports the first element of torture.
>
> Substantial evidence also supports the second element of torture – that defendant intended to cause Mario cruel or extreme pain and suffering for the purpose of revenge. Regarding intent, the record supports a reasonable inference that defendant attacked Mario when he was vulnerable, lying face down in his bed. (See, *Hale*, *supra*, 75 Cal.App.4th at p. 106 [the fact that attack began while victim was asleep and continued after [victim] awoke screaming supported inference that defendant intended to cause cruel physical pain].) Dr. Wagner opined (and defendant concedes on appeal) the first 12 wounds were inflicted on Mario's neck, face, shoulder, and back with the carving fork. Those wounds were not "particularly deep" or life-threatening, but would "[h]urt, probably, for sure."
> The next wounds were the 10 nonfatal incised wounds defendant inflicted under Mario's chin, and on his cheeks, ear, scalp, and forearm. Defendant then inflicted 11 nonfatal stab wounds and five fatal ones.
>
> Dr. Wagner testified all the wounds were inflicted while Mario was alive and would have caused him "pretty extreme pain" for the non-insubstantial 10 to 20 minutes it would have taken him to bleed to death. That Mario was in such pain would have been obvious to defendant. Mario screamed – in "a very painful voice" – "Help, help. Why are you doing this

to me?" He screamed so loudly that a neighbor heard him in her closed condo over the sound of her television. Leon also heard the distinctive screaming despite his hearing difficulties. Yet defendant continued attacking despite Mario's distressed screams.

The fact that defendant inflicted so many nonfatal – yet "extreme[ly] pain[ful]' – wounds when he had available the lethal samurai sword supports the reasonable inference that defendant intended to inflict cruel or extreme pain and suffering before finally delivering the coup de grace.

Substantial evidence also supports the jury's finding that defendant's motive was revenge. Defendant admitted his relationship with Mario became distant after the second December incident, and that he was upset with Mario after defendant was arrested in January – after which the brothers had "absolutely no communication" and never reconciled. Defendant acknowledged he felt like he "was treated like just somebody that wasn't part of the family." And he described Mario as the "little enforcer" who was "just creeping over [defendant's] shoulder 24/7." Minerva testified defendant told her he was upset because "he thought that [she] was picking Mario over him." All of this evidence supports the reasonable inference that defendant's attack on Mario was motivated by revenge.

In sum, substantial evidence supports defendant's conviction for torture under section 206.

(Lodgment No. 6, ECF No. 15-13 at 29–31.)

As to the first element of the crime of torture, "all that is required as to the nature of the injury is 'great bodily injury,' i.e., 'a significant or substantial physical injury.' Abrasions, lacerations and bruising can constitute great bodily injury." *People v. Jung*, 71 Cal. App. 4th 1036, 1042 (1999) (citation omitted). As the state appellate court correctly found, the bruises, abrasions, puncture wounds, and stab wounds Mario suffered clearly satisfy the first element of the crime of torture.

As to the second element of the crime of torture, Dr. Glenn Wagner, the medical examiner who conducted Mario's autopsy, testified as follows:

///

///

[DR. WAGNER]:   Once the paper bags had been removed and photographs taken both by police and by medical examiner staff, the injuries noted was [sic] extensive bruising of the face and scalp, more right sided than left, particularly on the face.

There were incised or long cuts, if you will, on the scalp, under the chin, forehead on the left side, and cheek." On the front side of the body, characteristic – what looked like puncture marks on the neck, as well as some bruising, particularly on the right side.

There were five deep stab wounds to the upper right chest:  four on the chest itself and one in the upper arm, extending into the armpit.  There was a stab wound of the abdomen, some superficial injuries on the right hand, looked like puncture marks.

Deep but incised wounds of the left arm, with a large gaping wound in the forearm, a very superficial, linear incised wound on the inside of the forearm, and then injuries on the hand.  No injuries to the legs.  No injuries to the genitalia or pelvis.

On the back side, there were a series of, essentially, puncture wounds over the left shoulder, right shoulder, and back.  Those predominantly on the left shoulder and back are patterned, which suggested one type of instrument, whereas those on the right side, for the most part, are stab wounds for the same type of characteristics as seen on the front.

The lower back showed extensive bruising related to body movement and the settling of blood from the injuries.

(Lodgment No. 2, ECF No. 15-6 at 18-19.)

Mario suffered three types of wounds: bruises and abrasions which were likely caused by punching, puncture wounds which were likely caused by the barbeque fork, and deep stab wounds which were caused by the samurai sword.  (Lodgment No. 2, ECF No. 15-6 at 40–45.)  Dr. Wagner testified all the wounds were inflicted while Mario was alive.  (*Id.* at 63.)  The deep samurai sword wounds were fatal, and thus Wagner concluded the abrasions and puncture wounds caused by the barbeque fork were inflicted first:

[DR. WAGNER]:  If you start with a person who is prone and getting punched, probably.  My thought process is it goes from punch to fork to

17-cv-02572-GPC-JLB

sword. I suppose it could go another away, but we just know that the sword injuries are fatal. Whatever started this probably started as a punching thing, and then somewhere along the line, a fork was introduced.

And there are fork injuries that move over the shoulders to the neck, to the face, if that is, in fact, the right hand. But the bulk of those puncture marks appear to me to go from a left to a right position, which suggests to me he is raising up and turning.

That still allows for the left arm and left side to be put into some type of defensive posturing with whatever results. Because there's active motion, it also means that those incised wounds are going to be primarily superficial, which they are.

At some point, though, he gets skewered, and he's not moving anymore. (*Id.* at 91.)

Wagner testified Mario had puncture wounds from the barbeque fork on his face, neck, and back. (*Id.* at 40.) The fork had been used with such force that its tines were bent, likely from impact with Mario's rib cage and spine. (*Id.* at 41.) The deep, fatal stab wounds were inflicted by the samurai sword. (*Id.* at 42.) Two of those stab wounds were "incised," meaning the sword had been stabbed far enough into Mario's body that the hilt of the sword had caused abrasions to his skin and Figueroa would have had to twist it to remove it from Mario's body. (*Id.* at 42–43, 59.) These two wounds were also "through and through" Mario's body, and were thus likely the wounds that resulted in the sword's tip being bent by the force of traveling through Mario's body and hitting the subfloor beneath him. (*Id.* at 43.) The stab wounds punctured both of Mario's lungs, cut the top part of his heart and aorta, and injured his trachea, esophagus, kidney, and spleen. (*Id.* at 44–45, 52.) The injuries to Mario's lungs collapsed them, making it impossible for him to breathe. (*Id*. at 46.) According to Wagner, the injuries inflicted on Mario would have caused "pretty extreme pain," and it would have taken ten to twenty minutes for him to bleed to death, during which time he would have been in pain. (*Id.* at 63–65.) The order in which the wounds were inflicted—punching and non-fatal but deep puncture wounds inflicted first— and the ferocity with which they were inflicted—both the barbeque fork and the samurai

sword were bent from the force and the sword had to be twisted to remove it from Mario's body—support the state court's conclusion that Figueroa intended to inflict cruel or extreme pain. *See Maquiz*, 907 F.3d at 1217.

The state appellate court also correctly concluded that there was sufficient evidence to establish that Figueroa inflicted cruel or extreme pain on Mario for the purpose of revenge. Figueroa's mother, Minerva Figueroa, testified that when Figueroa was thirteen or fourteen years old, she moved from San Diego to Seattle, taking all her children except Figueroa with her. (Lodgment No. 2, ECF No. 15-4 at 78–69.) Figueroa lived with his father in San Diego until Minerva and her other children returned to San Diego ten years later. (*Id.* at 69.) Figueroa eventually moved in with Minerva and Mario. (*Id.*)

Tensions escalated in the household over Figueroa's behavior and alcohol or drug use and police were called to the residence three times before the murder. (*Id.* at 78.) Minerva testified that during one of the incidents, Mario sat on Figueroa until police arrived. (Lodgment No. 2, ECF No. 15-5 at 41.) Figueroa was arrested, and when he returned home he was upset with Minerva and Mario. (*Id.* at 49.) Figueroa told Minerva he thought she was favoring Mario over him, and Figueroa stopped calling her "mom" in the months leading up to the murder. (*Id.* at 54; Lodgment No. 2, ECF No. 15-4 at 93.) Mario and Figueroa never reconciled. (Lodgment No. 2, ECF No. 15-4 at 92–93.)

Figueroa testified that when he returned home after being arrested, he was upset and "felt like I was treated like just somebody that wasn't part of the family." He admitted that he stopped calling Minerva "mom." (Lodgment No. 2, ECF No. 15-7 at 84.) Figueroa viewed Mario as wanting to be a "little enforcer," and felt that Mario "would, like, sit there and, like, look at me and, you know, like – like I felt somebody just creeping over my shoulder 24/7 . . . ." (*Id.* at 85.) Taken together, this evidence was sufficient to support a determination that Figueroa intended to inflict cruel or extreme pain on Mario for the purpose of revenge.

///

///

The state court's application of *Jackson* was neither contrary to, nor an unreasonable application of, clearly established Supreme Court law. *See Yarborough*, 540 U.S. at 4. Figueroa is therefore not entitled to relief as to this claim.

3.  Request for an Evidentiary Hearing

Although Figueroa does not ask for an evidentiary hearing in his case, Respondent has argued he is not entitled to one. (Answer, ECF No. 4-1 at 22–23.) Evidentiary hearings in § 2254 cases are governed by AEDPA, which "substantially restricts the district court's discretion to grant an evidentiary hearing." *Baja v. Ducharme*, 187 F.3d 1075, 1077 (9th Cir. 1999). The provisions of 28 U.S.C. § 2254(e)(2) control this decision:

(2) If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that –

(A) the claim relies on –

(i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or

(ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and

(B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

28 U.S.C. § 2254(e)(2).

In deciding whether to grant an evidentiary hearing, the court "must [first] determine whether a factual basis exists in the record to support the petitioner's claim[s]." *Insyxiengmay v. Morgan*, 403 F.3d 657, 669 (9th Cir. 2005) (quoting *Baja*, 187 F.3d at 1078). Where the issues raised by the petitioner can be resolved by reference to the state court record, no evidentiary hearing is required. *Cullen v. Pinholster*, 563 U.S. 170, 183 (2011). If not, the court must "ascertain whether the petitioner has 'failed to develop the

29

factual basis of a claim in State court.'" *Insyxiengmay*, 403 F.3d at 670 (quoting *Baja*, 187 F.3d at 1078). A failure to develop the factual basis of a claim in state court implies some "lack of diligence, or some greater fault, attributable to the prisoner or the prisoner's counsel." *Williams v. Taylor*, 529 U.S. 420, 432 (2000). The Supreme Court has said that "[d]iligence will require in the usual case that the prisoner, at a minimum, seek an evidentiary hearing in state court in the manner prescribed by state law." *Id.* at 437. As discussed above, Figueroa's claims can be resolved by reference to the state court record. Moreover, Figueroa did not seek an evidentiary hearing in state court. (Lodgment Nos. 4, 7, ECF Nos. 15-11, 15-14.)

Further, the Supreme Court in *Pinholster* held that where habeas claims have been decided on their merits in state court, a federal court's review must be confined to the record that was before the state court. 563 U.S. at 181–82. Figueroa can only proceed to develop additional evidence in federal court if either § 2254(d)(1) or (d)(2) are first satisfied. *See Sully v. Ayers*, 725 F.3d 1057, 1075 (9th Cir. 2013) (stating that "an evidentiary hearing is pointless once the district court has determined that § 2254(d) precludes habeas relief" (citing *Pinholster*, 563 U.S. at 203 n.20)). For all the reasons discussed above, Figueroa is not entitled to federal habeas relief pursuant to § 2254(d)(1) or (d)(2). Accordingly, the Court agrees that Figueroa is not entitled to an evidentiary hearing.

## V. CONCLUSION

**IT IS HEREBY RECOMMENDED** that the Court issue an order: (1) approving and adopting this Report and Recommendation, and (2) directing that judgment be entered **DENYING** the Petition for Writ of Habeas Corpus.

**IT IS ORDERED** that no later than **March 25, 2019**, any party to this action may file written objections with the Court and serve a copy on all parties. The document should be captioned "Objections to Report and Recommendation."

**IT IS FURTHER ORDERED** that any reply to the objections shall be filed with the Court and served on all parties no later than **April 8, 2019**. The parties are advised that

17-cv-02572-GPC-JLB

failure to file objections within the specified time may waive the right to raise those objections on appeal of the Court's order. *See Turner v. Duncan*, 158 F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153, 1156 (9th Cir. 1991).

**IT IS SO ORDERED.**

Dated: February 25, 2019

Hon. Jill L. Burkhardt
United States Magistrate Judge