1
2
3
4
5
6
7
8
9
10

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

11

ALBERTO GONZALEZ FIGUEROA,
JR.,

Petitioner,

v.

WARREN L. MONTGOMERY, Warden,

Respondent.

12
13
14
15
16

Case No.:  3:17-cv-02572-GPC-JLB

**ORDER ADOPTING REPORTS AND
RECOMMENDATIONS, AND
DENYING PETITION FOR WRIT
OF HABEAS CORPUS**

**[ECF Nos. 1, 11, 20]**

17
18
19
20
21
22

Petitioner Alberto Gonzalez Figueroa, Jr. ("Petitioner"), a state prisoner
proceeding pro se, filed a Petition for Writ of Habeas Corpus ("Petition") pursuant to 28
U.S.C. § 2254.  ECF No. 1.  The Petition made four claims, the fourth claim not being
presented in the California Supreme Court.  *Id.* at 6–9.[1]  Notices were sent regarding
possible dismissal of the Petition for failure to exhaust state court remedies, ECF Nos. 3
and 4, and Petitioner elected to abandon the fourth claim, ECF No. 7.  Respondent

23
24
25
26
27
28

---

[1] References to specific page numbers in a document filed in this case correspond to the
page numbers assigned by the Court's Electronic Case Filing ("ECF") system.

Warren L. Montgomery ("Respondent") filed a Response, ECF No. 14, and Petitioner replied, stating "[a] Traverse will not be filed,"[2] ECF No. 18.

Under 28 U.S.C. § 636(b)(1) and Local Civil Rule HC.2 of the U.S. District Court for the Southern District of California, Magistrate Judge Jill L. Burkhardt submitted two Reports and Recommendations.  The first Report and Recommendation recommended that the Court (1) approve and adopt the first Report and Recommendation, and (2) deem the unexhausted fourth claim abandoned and dismiss it.  ECF No. 11.  The second Report and Recommendation ("R&R") recommended that the Court (1) approve and adopt the R&R, and (2) deny the Petition.  ECF No. 20.  Petitioner filed an Objection to the R&R, ECF No. 21, and Respondent did not file a reply to the Objection.

After careful consideration of the record and applicable law, and for the reasons provided below, the Court **ADOPTS** the Magistrate Judge's two Reports and Recommendations, **OVERRULES** Petitioner's Objection to the R&R, **DENIES** the Petition, and **DENIES** a certificate of appealability.

## BACKGROUND

**I.    Procedural History**

### A.    Jury Trial and Appeal in State Court

On November 20, 2013, the San Diego County District Attorney's Office filed an Information charging Petitioner with: (1) one count of murder, a violation of California Penal Code ("Penal Code") Section 187(a) ("count one"); (2) one count of torture, a violation of Penal Code Section 206 ("count two"); (3) one count of assault with a deadly weapon, a violation of Penal Code Section 245(a)(1) ("count three"); and (4) one count of

---

[2] The ECF system has docketed the Petitioner's responding document as a "Traverse," since the document is an answer to the Respondent's Response.  *See* ECF Nos. 12 and 17 (referencing the filing of a traverse to answer the Response).  However, to respect Petitioner's statement, the court will not reference the document as a Traverse.

2

possession of a deadly weapon at a penal institution, a violation of Penal Code Section 4502(a) ("count four").  Lodgment No. 1, ECF No. 15-1 at 15–17.  The Information further alleged that Petitioner personally used a deadly and dangerous weapon within the meaning of Penal Code Sections 1192.7(c)(23) and 12022(b)(1).  *Id.* at 16.  In addition, the Information alleged that Petitioner had suffered two prior convictions for which he had served a prison sentence, within the meaning of Penal Code Sections 667.5(b) and 668.  *Id.* at 17.

Following a jury trial, Petitioner was convicted of counts one and two.  *Id.* at 232– 33.  He pleaded guilty to count three, and count four was dismissed.  Lodgment No. 2 (Rep.'s Appeal Tr. vol. 9), ECF No. 15-16 at 11–13, 16–17.  Petitioner was sentenced for a total term of thirty-one years-to-life in prison.  *Id.* at 24–31.

Petitioner appealed his conviction to the California Court of Appeal for the Fourth Appellate District.  Lodgment No. 4, ECF No. 15-11.  The state appellate court upheld the conviction in a written, unpublished opinion.  Lodgment No. 6, ECF No. 15-13. Petitioner filed a petition for review in the California Supreme Court, which denied the petition without citation of authority.  Lodgment Nos. 7 and 8, ECF Nos. 15-14 and 15- 15.

**B.     Habeas Petition in Federal Court**

Petitioner filed the Petition in this Court on December 26, 2017.  ECF No. 1.  The Petition stated four grounds for relief.  In the first and third grounds for relief, Petitioner claimed that his due process rights were violated when the trial court improperly instructed the jury on heat of passion, manslaughter, self-defense, imperfect self-defense, and provocation.  *See id.* at 6, 8.  In the second ground for relief, Petitioner claimed that there was insufficient evidence to support his conviction for torture.  *Id.* at 7.  In the fourth ground for relief, which was marked as not being raised in the California Supreme Court, Petitioner claimed that there was improper jury selection.  *Id.* at 9.

On the fourth claim, two notices regarding possible dismissal of Petition for failure to exhaust state court remedies were submitted.  ECF Nos. 3 and 4.  The notices provided Petitioner with four options on how to proceed to avoid dismissal of the Petition, including formally abandoning the unexhausted claim.  ECF No. 3 at 4; ECF No. 4 at 4. Petitioner elected to abandon the unexhausted fourth ground for relief, "aware of losing [his] ability to ever raise [his] unexhausted claim in federal court again."  ECF No. 7. Subsequently, on April 2, 2018, the Magistrate Judge submitted a Report and Recommendation, recommending that the Court (1) approve and adopt the Report and Recommendation, and (2) direct that the Petitioner's fourth unexhausted claim be deemed abandoned and dismissed.  ECF No. 11.  Petitioner did not object.

On June 11, 2018, Respondent filed a Response to the Petition and the related Memorandum of Points and Authorities.  ECF No. 14.  Petitioner replied, stating "[a] Traverse will not be filed" because he believed enough argument and evidence were presented to grant the Petition.  ECF No. 18.  On February 25, 2019, after reading and considering the Petition, Respondent's Response and supporting Memorandum, Petitioner's document answering the Response, the lodgments, and other documents filed in this case, the Magistrate Judge filed the second Report and Recommendation.  ECF No. 20.  The R&R recommended that the Court (1) approve and adopt the R&R, and (2) direct that judgment be entered denying the Petition.  *Id.*  Petitioner filed an Objection to the R&R on March 19, 2019.  ECF No. 21.

## II.   Factual Background

In a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254, the Court gives deference to state court findings of fact and presumes them to be correct.  28 U.S.C. § 2254(e)(1).  The petitioner may rebut the presumption of correctness, but only "by clear and convincing evidence."  *Id.*; *see also Parle v. Fraley*, 506 U.S. 20, 35–36 (1992)

1   (holding that findings of historical fact, including inferences properly drawn from these

2   facts, are entitled to a statutory presumption of correctness).

The state appellate court provided the following statement of facts:

## I.  *Prosecution Case*

In April 2013, 35-year-old defendant [the Petitioner] lived in a two-bedroom condo unit in Chula Vista with his mother (Minerva Gonzalez Figueroa), grandfather (Leon Gonzalez), and 24 year-old younger brother (Mario Figueroa).  Minerva and Leon originally moved into the unit by themselves, but were later joined by Mario, and then by defendant.  Leon slept in the master bedroom; Minerva and Mario shared the other bedroom (Minerva slept on a bed, Mario on a folding bed on the floor); and defendant slept on a sofa bed in the living room.  Mario looked up to defendant, who was taller and stronger.

It was undisputed at trial that on April 2, 2013, defendant stabbed Mario to death with a samurai sword and carving fork in Mario's bedroom.  The key disputes were whether defendant had done so out of self-defense, and whether he had tortured Mario.

## A.  *Three Prior Incidents*

To establish motive and intent, the prosecution introduced evidence of three incidents involving defendant and Mario in December 2012 and January 2013.

On December 4, 2012, Minerva called 911 to report that she suspected defendant was on drugs and was "scaring the shit out of us."  Minerva locked Leon in his bedroom, and locked herself and Mario in theirs.  When police arrived, they saw through a window that defendant was holding a steak knife.  When defendant noticed the police, he set down the knife and cooperated.  He did not appear to the police to be under the influence.  Minerva sought unsuccessfully to have the police remove defendant from the property.

Later in December, defendant and Mario argued after defendant confronted Mario for not washing his own dishes.  Mario told defendant, "Let's take it outside."  Even Minerva told her sons to "take it outside" so they would not fight in their home.  The brothers went outside and argued

5

more, until a neighbor who is a police officer intervened.  Minerva testified defendant and Mario stopped speaking to each other because of this incident.

On January 18, 2013, defendant came home drunk, despite Minerva's prior request that he not drink alcohol while staying with her.  Defendant was falling over and breaking furniture and other items.  He became hostile and lunged and grabbed at Minerva, telling her to "shut up, bitch."  Mario intervened nonviolently to protect Minerva.  Defendant tried to retrieve a black bag in which Minerva knew he kept several kitchen knives and screwdrivers.  Mario restrained defendant, wrestled him to the ground, and sat on him.  Mario was having trouble restraining defendant, so he told Minerva to call 911, which she did (three times).  When the police arrived, Mario was still struggling to restrain defendant and asked the officers for help.  Police intervened and arrested defendant.

When defendant returned home after his arrest, he was upset with Mario and Minerva.  He stopped calling Minerva "mom," and he had "absolutely no communication" with Mario.  As defense counsel put it, "you could probably cut the tension with a knife . . . ."  The brothers never reconciled or spoke to each other.

Minerva testified defendant told her after the January 18 incident that he was upset because "he thought that [she] was picking Mario over him."  Minerva also testified that when defendant was 13 or 14 years old, she moved with Mario and her two daughters to Seattle, where they lived for about 10 years.  Defendant stayed in San Diego with his father.

After the January 18 incident, Mario suggested to Minerva that they relocate his set of three samurai swords, which were on a display stand behind the television in the living room.  Mario explained he did not want defendant "to have something easy to reach for" if they got into another fight.  Minerva agreed and put the swords underneath the mattress of her bed.  She began to sometimes lock her bedroom door at night, and considered evicting defendant.

### B. *April 2, 2013*

On the morning of April 2, 2013, Minerva followed her normal routine.  She woke at 6:00 a.m. and got ready for work.  Before she left at about 7:00 a.m., Mario yelled out, " 'Bye mom. I love you. Have a good day.' "  Minerva saw defendant—who was normally a heavy and late

6

sleeper—lift his head and look at her from under the covers before putting the covers back over himself.  Minerva did not say goodbye to defendant because they were still "upset with each other" and "were a little estranged."

A few minutes later, neighbor Veronica Mader was watching television in her condo with the doors and windows closed.  She thought she heard someone screaming, but "[a]t the beginning . . . didn't pay too much attention."  When she heard it again, she muted the television.  This time, Mader heard someone screaming—in "a very painful voice"—" 'Help, help. Why are you doing this to me?' "  She took her phone, ran outside, and yelled through the window of defendant's condo to ask if anyone needed help.  She heard nothing.  Mader called 911 at 7:18 a.m.  She returned to her condo and quickly prepared her children for school to get them out of the complex.

Leon, who was then 87 years old and had hearing difficulties, had awakened at 7:00 a.m. to take medicine and was resting in his bed when he heard Mario screaming for help.  Mario sounded scared; Leon had never heard him scream like that before.  Leon got up, went to Mario's bedroom, opened the door, and saw defendant on top of Mario with his knee on Mario's chest.  Leon placed a hand on defendant's shoulder, and Mario looked at him and pleaded, "Help me, grandfather."  Leon saw defendant striking Mario's head and face with his right hand, but could not see if defendant had any weapons.  Leon never saw Mario hit defendant or hold any weapons.  Leon told defendant to leave Mario alone.  Defendant told Leon, "There is nothing going on," and made a hand gesture for Leon to leave.  Leon left the room.  Defendant never asked Leon for help.

Leon went to the bathroom, then tried to call the police on his cell phone but was having trouble seeing the numbers.  Before Leon could call, he encountered defendant in the hallway.  Defendant asked Leon what he was doing with the phone.  When Leon said he was going to call the police, defendant took the phone from him, opened the door to Mario's bedroom, and threw the phone into the room.  Defendant seemed calm to Leon.  Leon pointed out to defendant that defendant had blood on his shorts; defendant did not respond.  Leon told defendant he was going to go outside to get some fresh air, but he really intended to have a neighbor call the police.  A neighbor called 911 for Leon at 7:24 a.m.

3:17-cv-02572-GPC-JLB

About five minutes after she called 911, neighbor Mader was heading to her car to take her children to school when she observed defendant in the open doorway of his condo getting a bag out of a closet. She asked defendant if he was okay. He "very calm[ly]" replied, "Yeah. I'm fine. I'm fine." Mader told defendant she had called 911 because she thought something was wrong. Defendant did not respond, but as Mader was backing her car out, she saw defendant leaving in a rush—so much so that he ran in front of her car and she had to apply the brakes. Defendant never asked Mader for help.

Another neighbor, Darnella Hosch, was walking her dog in the condo complex when she saw defendant riding a bicycle and wearing a backpack. When Hosch said "good morning" to defendant, he seemed "very nervous" and almost fell off his bicycle. Hosch noticed blood on defendant's leg as he was "racing past" her. Defendant did not ask Hosch for help.

Chula Vista police officers responding to the 911 calls entered the family's condo and found Mario unresponsive and covered in blood. The officers notified dispatch, who sent paramedics to the scene. Paramedics pronounced Mario dead at the scene at 7:42 a.m.

Chula Vista dispatchers broadcasted that there had been a murder and identified defendant as the suspect. As dispatchers were describing defendant, he rode by a National City police officer about eight miles from the crime scene. The officer detained defendant at gunpoint. Defendant had blood on his shoes, calf, shorts, hands, arms, cheek, and head. There was also fecal matter on defendant's shorts. Defendant had a small wound on a knuckle on his right hand, an injury to the middle knuckle of his left ring finger, and an injury on his chest and left shoulder. His backpack contained two screwdrivers, a knife, and a glove, none of which had blood on them.

## C. *Crime Scene Evidence*

Investigators found no signs of struggle anywhere in the family's condo. Behind the closed door of Mario's bedroom, they observed Mario's body, covered in blood, faceup atop bedding, on the floor. One of Mario's legs was still partially beneath his bedding.

Under the bedding, investigators found a carving fork and samurai sword. There was blood on the carving fork, and its tines were bent. The sword was "covered in" blood, and its blade was bent.

Mario's blood had pooled under his body and soaked through the bedding, a rug, the carpet, and the carpet pad, ending up on the concrete subfloor.  The sword had stabbed through the bedding and carpeting and chipped the subfloor.  There were droplets of blood throughout the room. Investigators found two samurai swords and one sheath between the mattress and box spring of Minerva's bed.

Elsewhere in the family's condo, investigators found a pair of shorts in the washing machine with blood and fecal matter on them.  They also found a glove with blood on it on the kitchen counter.

Mario's DNA matched blood samples taken from the fork, the sword, the glove, the bedroom walls, and defendant's leg.

### D.  *Medical Evidence*

Glenn Wagner, M.D., the Chief Medical Examiner of San Diego County, conducted the autopsy on Mario.  He had previously conducted about 14,000 autopsies.  In addition to extensive bruising to Mario's face and scalp, Dr. Wagner observed that Mario suffered 38 wounds that were consistent with having been inflicted by the carving fork and samurai sword. [FN 3: Dr. Wagner clarified that this total was not indicative of the total number of blows "[b]ecause you got fork injuries—so it's half of that—and at least two of the chest wounds are through and through . . . ."]

Mario had 12 puncture wounds—consistent with having been inflicted by the carving fork—on his neck, face, shoulder, and back. Dr. Wagner stated none of these wounds were "particularly deep" or life-threatening, but would "[h]urt, probably, for sure."

Mario suffered 10 incised wounds (lacerations longer than they are deep) under his chin, and on his cheeks, ear, scalp, and forearm.  Dr. Wagner indicated many of these wounds appeared to have been inflicted when Mario was defending himself or moving.

Mario also suffered 16 stab wounds (wounds deeper than they are long), five of which would independently have been fatal.  The stab wounds punctured both of Mario's lungs; cut his heart and aorta; and damaged his trachea, esophagus, spleen, and one kidney.

Regarding sequence, Dr. Wagner opined Mario first suffered blunt force injuries to his head and face, then puncture wounds inflicted by the carving fork, then the incised wounds, then the stab wounds.  Dr. Wagner further opined Mario's earlier injuries were inflicted while he was face-down, and the later injuries were inflicted after he turned face-up.  Dr. Wagner opined they were all inflicted while Mario was alive, and that they would have caused "pretty extreme pain."  Dr. Wagner determined Mario bled to death over the course of about 10 to 20 minutes.

Dr. Wagner also testified about defendant's injuries.  He opined the injuries to defendant's hands were consistent with defendant punching something, and holding a knife that slipped.  The wounds on defendant's chest were superficial.

## II.  *Defense Case*

Defendant testified as the only defense witness.  He admitted killing Mario, but claimed it was in self-defense.

### A.  *Three Prior Incidents*

Defendant addressed and downplayed the significance of the December 2012 and January 2013 incidents.  Defendant surmised his mother called police during the December 4 incident because he had his music or the television too loud.  He explained he was holding a knife when police arrived because he was cutting steak.

Regarding the second December incident, defendant initially testified he politely asked Mario to clean up after himself, but later acknowledged he might have said, "Why don't you clean your shit up, man.' "  Mario became defensive and challenged defendant to a fight.  Defendant admitted "there was kind of a distance" between him and Mario after that incident.

Defendant admitted he came home drunk on January 18, 2013, but stated he apologized to Minerva and reconciled with her.  Defendant and Mario, however, never had another conversation with each other and kept their distance.  Defendant acknowledged he felt like he "was treated like just somebody that wasn't part of the family."  He described Mario as the "little enforcer" who was "just creeping over [defendant's] shoulder 24/7."  Defendant said he and Mario had no altercations between January 18 and April 2.

## B. *April 2, 2013*

Defendant woke to the sound of Minerva and Mario's voices on April 2. He saw Minerva leave for work, but stayed in bed to decide what kind of exercise he would do. He got up, made up the sofa bed and folded it away, put on his shoes and shorts (but no shirt), and headed toward the bathroom. As defendant walked quickly down the hall, he and Mario unexpectedly and "rough[ly]" bumped into each other. The collision was followed by an immediate, "heated," expletive-laden exchange. Defendant continued on to the bathroom, where he resolved to avoid any further confrontation with Mario.

Defendant decided to start a load of laundry before leaving to work out. Some of Minerva's sheets were in the dryer, so defendant was going to take them into her and Mario's room. He went to the room to open the door *without* the laundry because it would be too hard to open the door if his hands were full.

When defendant opened the bedroom door, Mario was standing with his back to him. Mario appeared startled, jumped around, and yelled, "What the fuck, motherfucker. I thought I fucking told you . . . ." As Mario turned, defendant saw that he was holding a carving fork in one hand and a samurai sword in the other. [FN 4: Defendant testified that although he grilled food on the barbeque "almost every day," he had never seen this particular carving fork before. He also testified he knew Mario had samurai swords, but claimed to have never seen the set of three that had previously been stored in the living room where defendant slept.] Defendant "just went blank from there" and "tuned everything out." Mario swung the carving fork and hit defendant's hand. Defendant closed his eyes, went straight toward Mario, and started punching. Defendant said he was "shocked" and "scared shitless," literally—he defecated in his shorts.

Defendant's hands struck Mario and the men got tangled up in Mario's bedding and fell to the floor. Defendant's mind "went blank" as he felt he was "fighting for [his] life." He felt a pain or rush in his body and thought he had been stabbed. He "couldn't focus on anything." Defendant testified he blanked out and could not recall the details of the attack, but claimed he was in fear for his life every time he stabbed Mario. He claimed he did not hear Mario screaming for help.

Defendant said he "came back to [his] senses" when Leon entered the room as defendant and Mario were fighting over the fork. Defendant was worried Leon would trip and fall, so defendant said in Spanish, "No, no, grandpa. Everything is okay. Don't you worry." Leon pointed out that defendant had blood on his shorts. Defendant then saw Mario was coughing up blood and moving his hand near a knife and some screwdrivers under Minerva's bed, so defendant picked up those items.

After Leon left the room, defendant left as well to make sure Leon was okay. He saw Leon trying to make a phone call and took the phone to help him. When the "phone wasn't working or anything," defendant opened the door to Mario's bedroom and threw the phone inside the room. Defendant admitted he did not know why he did that. When defendant opened the door, he could only see the lower part of Mario's body, which "was just laying there."

Defendant testified he put the knife and screwdrivers in his backpack because he was thinking, " 'I better hold onto these because what if [Mario] runs out of the room and attacks me again.' " However, defendant admitted he did not remove the carving fork or samurai sword from the bedroom. Defendant changed his shorts (because they had blood and feces on them) and rode off on his bike to look for Leon because he was concerned for Leon's safety.

Defendant acknowledged he must have inflicted all of Mario's wounds, but said he was merely defending himself. Defendant said he did not recall how he inflicted each injury because he was in shock when it happened. Defendant admitted he never went back to check on Mario or summoned help for him.

Defendant testified the wound on one of his knuckles was from the fight with Mario. He acknowledged that, despite being in a fight for his life, he had hardly any injuries.

### III. *Rebuttal*

As its sole rebuttal witness, the prosecution called a police detective who was present when defendant was being processed for evidence. The detective testified that when defendant was asked how he received the injury on one of his hands, defendant said it happened when he fell off his bike.

3:17-cv-02572-GPC-JLB

Lodgment No. 6, ECF No. 15-13 at 2–13.

Petitioner did not contest the presentation of the facts provided by the state appellate court.  *See* ECF Nos. 1, 18, and 21.  Instead, he referred to the state appellate court's presentation of events to support his claims.  *Compare* ECF No. 21 at 3 *with* ECF No. 15-13 at 4 ("After the January 18 incident . . . considered evicting defendant."), 11 n.4 ("Defendant testified . . . defendant slept.").

## **LEGAL STANDARD**

### I.    **The Magistrate Judge's Report and Recommendation**

The Court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge."  28 U.S.C. § 636(b)(1).  At the same time, since an objection to the recommendation (specifically the R&R) was made, the Court reviews the Magistrate Judge's findings and recommendations de novo.[3]  *Id.*; *see also Johnson v. Finn*, 665 F.3d 1063, 1072 (9th Cir. 2011).

### II.    **The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA")**

Under Section 2254 of AEDPA, which is the basis for the Petition, a court will not grant a habeas petition with respect to any claim adjudicated on the merits by the state

---

[3] Petitioner did not explicitly identify which specific portion of the R&R he objects to.  *Cf.* 28 U.S.C. § 636(b)(1) (discussing that the court makes de novo determinations "of those *portions* of the report or *specified* proposed findings or recommendations to which objection is made" (emphasis added)); *Djelassi v. ICE Field Office Dir.*, 434 F. Supp. 3d 917, 919 (W.D. Wash. 2020) ("The Court reviews de novo those portions of the report and recommendation to which specific written objection is made."), *appeal dismissed*, No. 20-35244, 2020 WL 5513355 (9th Cir. June 19, 2020); *United States v. Diaz-Lemus*, No. CR-09-2613-TUC-DCB, 2010 WL 2573748, at *1 (D. Ariz. June 22, 2010) ("De novo review . . . is unnecessary when a party makes general and conclusory objections that do not direct the court to a specific error in the magistrate's proposed findings and recommendations.").  Accordingly, the Court will incorporate Petitioner's Objection into the Court's analysis where relevant.

3:17-cv-02572-GPC-JLB

court unless that adjudication "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d); *see also Early v. Packer*, 537 U.S. 3, 8 (2002) (discussing how Section 2254(d) "forecloses" relief unless one of the conditions are met).

The Court may grant relief pursuant to Section 2254(d)(1) on two grounds—either the state court decision was "contrary to" clearly established federal law, or the state court decision "unreasonably applied" clearly established federal law.  The two clauses in the Section have independent meaning and either can be grounds for relief.  *Bell v. Cone*, 535 U.S. 685, 694 (2002).  The term "clearly established Federal law" in Section 2254(d)(1) means "the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision."  *Lockyer v. Andrade*, 538 U.S. 63, 71–72 (2003).  The state court need not cite Supreme Court precedent when resolving a habeas corpus claim, "so long as neither the reasoning nor the result of the state-court decision contradicts [Supreme Court precedent]."  *Early*, 537 U.S. at 8.

A federal court may grant relief under the "contrary to" clause of Section 2254(d)(1) if the state court applied a different rule than the governing law established by the Supreme Court, or if it decided a case differently than the Supreme Court on a set of materially indistinguishable facts.  *Bell*, 535 U.S. at 694.  Alternatively, a federal court may grant relief under the "unreasonable application" clause of Section 2254(d)(1) if the state court correctly identified the governing legal principle from Supreme Court decisions but unreasonably applied it to the facts of the particular case.  *Id.*  The state court's application must be not just erroneous, but "objectively unreasonable."  *Yarborough v. Gentry*, 540 U.S. 1, 5 (2003); *Lockyer*, 538 U.S. at 75; *see also Medina v. Hornung*, 386 F.3d 872, 877 (9th Cir. 2004) (discussing how when granting relief based

1    on this clause, the federal court must be "[e]xtraordinarily deferential to the state courts"

2    and show "error greater than clear error").

3         The Court may also grant relief pursuant to Section 2254(d)(2) if there was

4    "unreasonable determination of the facts in light of the evidence presented in the State

5    court proceeding."  However, "substantial deference" is given to the state trial court's

6    factual findings.  *Brumfield v. Cain*, 576 U.S. 305, 314 (2015).  While this deferential

7    standard does not mean an abandonment or abdication of judicial review, if reasonable

8    minds reviewing the record might disagree about the finding, that would not be sufficient

9    to supersede the trial court's determination.  *Id.*; *see also Davis v. Ayala*, 576 U.S. 257,

10   271 (2015) (discussing how under AEDPA, state court findings are presumed correct and

11   the petitioner has the burden of rebutting the presumption by clear and convincing

12   evidence).

13        When the state supreme court summarily denies the appeal and habeas petition, as

14   the California Supreme Court did in this case, the Court must "look through" the "'last

15   reasoned' state court decision" and presume that it provides the basis for the higher

16   court's denial of the claims.  *Id.*; *see Ylst v. Nunnemaker*, 501 U.S. 797, 803–06 (1991).

17   Here, the last reasoned state court decision will be that of the state appellate court, the

18   California Court of Appeal for the Fourth Appellate District, Lodgment No. 6, ECF No.

19   15-13.

20                                   **DISCUSSION**

21   **I.   Petitioner's Unexhausted Claim Four**

22        The Court first addresses the Petition's fourth claim of improper jury selection,

23   which was not raised in the California Supreme Court and which Petitioner elected to

24   abandon under full awareness that this claim cannot be raised in federal court ever again.

25   ECF No. 7.  The Magistrate Judge submitted a Report and Recommendation which

26   recommended to deem this fourth claim abandoned and dismiss it.  ECF No. 11.  *Cf.* 28

27

28

U.S.C. 2254(b)(1) ("[W]rit of habeas corpus . . . shall not be granted unless . . . the applicant has exhausted the remedies available in the courts of the State . . . .").

With no objections having been filed, the Court **ADOPTS** the Magistrate Judge's first Report and Recommendation and **DISMISSES** the fourth ground for relief.

## II.   Jury Instruction Error (Petition's Claims One and Three)

Petitioner argued that the trial court violated his due process rights when it refused to instruct the jury regarding provocation and a killing committed in the heat of passion, which would have negated the malice element of homicide and/or the premeditation and deliberation element of first-degree murder.  According to the Petitioner, the jury could have convicted him of voluntary manslaughter or second-degree murder instead of first-degree murder had they been properly instructed.  Petition, ECF No. 1 at 6, 8.  The Magistrate Judge in the R&R concluded that the state court's denial of this claim was neither contrary to, nor an unreasonable application of, clearly established Supreme Court law, and that the state court's denial was not based on an unreasonable determination of the facts.  ECF No. 20 at 22.  In his Objection to the R&R, Petitioner re-argued that with proper instruction, the jury could have convicted him of voluntary manslaughter or second-degree murder instead of first-degree murder.  ECF No. 21 at 2.  According to the Objection, based on the factual presentation provided by the state appellate court, *compare id.* at 3 *with* ECF No. 15-13 at 4, 11 n.4, "this incident was not premeditated" and "[f]urther investigation is required."  ECF No. 21 at 3.

The Court first provides a more detailed procedural history specific to the jury instruction issue to address Petitioner's claims.  Here, the trial judge rejected defense counsel's request to instruct the jury with CALCRIM Nos. 522 (concerning "provocation") and 570 (concerning "voluntary manslaughter, heat of passion, lesser included offense").  Lodgment No. 2 (Rep.'s Appeal Tr. vol. 7), ECF No. 15-8 at 13.

The trial judge declined to instruct the jury as requested, concluding that there was insufficient evidence to support either instruction.  *Id.* at 15.

Petitioner, in his appeal filed in the California Court of Appeal for the Fourth Appellate District and in his petition for review filed in the California Supreme Court, claimed that the trial judge's refusal to give the instructions was a constitutional error that prejudicially violated his due process rights.  Lodgment Nos. 4 and 7, ECF Nos. 15-11 and 15-14.  The California Supreme Court denied the petition for review without citation of authority.  Lodgment No. 8, ECF No. 15-15.  The state appellate court concluded that the trial judge's failure to give the instructions was constitutional error, but that the error was not prejudicial.  Lodgment No. 6, ECF No. 15-13.

In reaching its conclusion, the state appellate court applied the standard outlined in *Chapman v. California*, 386 U.S. 18, 24 (1967) (requiring a court to determine whether the constitutional error is harmless beyond a reasonable doubt), and wrote the following:

> Under the *Chapman* standard, we find the instructional error was not prejudicial.  " 'In determining whether error has been committed in giving or not giving jury instructions, we must consider the instructions as a whole [and] assume that the jurors are intelligent persons and capable of understanding and correlating all jury instructions which are given.' " (*People v. Yoder* (1979) 100 Cal.App.3d 333, 338.)  Error in failing to instruct the jury "is harmless when the jury necessarily decides the factual questions posed by the omitted instructions adversely to [the] defendant under other properly given instructions." (*People v. Lewis* (2001) 25 Cal.4th 610, 646.)  "In addition, closing arguments to the jury are relevant in evaluating prejudice." (*People v. Chavez* (2004) 118 Cal.App.4th 379, 388.)

> The jury was instructed with CALCRIM No. 505 regarding complete self-defense [footnote omitted], and CALCRIM No. 571 regarding imperfect self-defense [footnote omitted].  The jury also heard defendant's extensive trial testimony in support of these defenses and had the opportunity to evaluate his credibility.  By rejecting these defenses and finding defendant guilty of first degree murder, the jury necessarily disbelieved defendant's version of events.  Otherwise, the jury would have convicted defendant, at most, of voluntary manslaughter on an imperfect self-defense theory.

1    This conclusion is further supported by the fact the jury found
2    defendant guilty of first degree murder, which the jury was instructed
3    required a finding that defendant killed Mario with premeditation and
     deliberation [footnote omitted].  CALCRIM No. 521 specifically provides
4    that "[a] decision to kill made rashly, impulsively, or without careful
     consideration is not deliberate and premeditated."  By finding that defendant
5    premeditated and deliberated Mario's death, the jury necessarily concluded
6    he did not act rashly or impulsively in the heat of passion.  (*People v.*
     *Wharton* (1991) 53 Cal.3d 522, 572 ["By finding defendant was guilty of
7    first degree murder, the jury necessarily found defendant premeditated and
8    deliberated the killing.  This state of mind, involving planning and deliberate
     action, is manifestly inconsistent with having acted under the heat of passion
9    . . . and clearly demonstrates that defendant was not prejudiced by the failure
     to give his requested instruction."].)
10

11    In addressing CALCRIM No. 521 in closing argument, the prosecutor
12   noted the instruction is inconsistent with heat of passion:  "It just matters
     whether the killing is deliberate and premeditated.  The amount of time may
13   vary from person to person, how long they think about it and premeditate.  *If*
14   *it's made rashly or impulsively, right?  We are talking like a heat-of-passion-*
     *type thing.  Then maybe that's not deliberate and premeditated.*"  (Italics
15   added.)  This statement minimized any potential prejudice.

16    In light of the record, the jury instructions, the jury's verdict, and the
17   arguments of counsel, we conclude the trial court's failure to instruct the jury
     regarding heat of passion voluntary manslaughter was harmless beyond a
18   reasonable doubt.

19                    D.  *Second Degree Murder*

20    Having determined that defendant presented substantial evidence of
21   provocation for purposes of heat of passion voluntary manslaughter, we
     conclude he was also entitled to an instruction regarding provocation to
22   negate premeditation and deliberation for purposes of allowing the jury to
23   find second degree murder.  (See *People v. Padilla* (2002) 103 Cal.App.4th
     675, 678 [provocation for purposes of reducing murder from first degree to
24   second degree bears only a subjective component].)  However, for the same
25   reasons just discussed, we conclude this error caused defendant no prejudice.

26   Lodgment No. 6, ECF No. 15-13 at 24–27.

27                                18
28                                                          3:17-cv-02572-GPC-JLB

When an error of federal constitutional magnitude occurs at trial, a reviewing court on direct appeal must determine whether the error was harmless beyond a reasonable doubt. *Chapman*, 386 U.S. at 24. In its determination, the reviewing court must consider the trial record as a whole. *United States v. Hasting*, 461 U.S. 499, 509 (1983) ("Since *Chapman*, the Court has consistently made clear that it is the duty of a reviewing court to consider the trial record as a whole and to ignore errors that are harmless, including most constitutional violations . . . ."); *see, e.g.*, *Dixon v. Williams*, 750 F.3d 1027, 1036 (9th Cir. 2014), *as amended on denial of reh'g and reh'g en banc* (June 11, 2014). When a petitioner challenges the state court's determination of the harmless error under *Chapman* on federal habeas corpus review, the federal court must review the harmlessness determination under AEDPA's standard:

> When a *Chapman* decision is reviewed under AEDPA, "a federal court may not award habeas relief under § 2254 unless *the harmlessness determination itself* was unreasonable." And a state-court decision is not unreasonable if "'fairminded jurists could disagree' on [its] correctness." [A petitioner] therefore must show that the state court's decision to reject his claim "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."

*Davis v. Ayala*, 576 U.S. 257, 269–70 (2015) (emphasis in original) (citations omitted).

The Court finds the state appellate court's determination of harmless error as neither unreasonable nor "so lacking in justification" that there could be no fair-minded disagreement that the state court's decision was erroneous. The California Court of Appeal for the Fourth Appellate District reasonably determined that (1) any factual basis necessary to decide on "provocation" or "heat of passion" in favor of Petitioner were disbelieved by the jury, as evidenced by the jury's findings on self-defense and imperfect self-defense against Petitioner; and (2) the jury's finding of first-degree murder necessarily means that the jury believed that Petitioner committed murder with premeditation and deliberation, which are antithetical to provocation and heat of passion.

### A.     Jury's Findings on Self-Defense and Imperfect Self Defense and Their Implication on Provocation and Heat of Passion

First, it was not unreasonable for the state appellate court to determine that the jury's findings on self-defense and imperfect self-defense obviated any factual basis for a jury instruction on provocation and heat of passion.  As the basis for requesting the trial judge to instruct the jury with CALCRIM Nos. 522 ("provocation") and 570 ("voluntary manslaughter, heat of passion, lesser included offense"), defense counsel stated the following:

> Mr. Rouston:  . . . I believe my client, when he testified -- is that when he entered the room, first, he thought he startled his brother.  His back was towards him.  But then when his brother, Mario, turned around, he, Mario, said some profanities at my client and then swung what I believe to be the fork at my client, and at that point, essentially, the fight began.

> And, obviously, it was a very violent fight that pursued {sic}, and I think that -- I understand that the self-defense instruction, that applies, and then imperfect self-defense, but I don't think they are mutually exclusive.  I don't think that we can say that, "oh.  Well, you have imperfect self-defense and self-defense, so voluntary manslaughter doesn't apply."  I think that the jury could feel that this was a sudden quarrel that happened, and that my client acted because of that provocation with the knife, and acted rationally under the influence of the intense emotion that he was feeling at that time, which happened to be fear, which goes to our self defense.  But it's still an intense emotion that he's feeling, that made him act the way he did without due deliberation.

> So based on that, your honor, based on what I believe the testimony was, I'm asking for that CALCRIM Instruction 570.  And of course, if that is given, then 522, "Provocation," the effect on the degree of murder, would also have to be given in conjunction with that.  Other than that, I'd submit, your honor.

Lodgment No. 2 (Rep.'s Appeal Tr. vol. 7), ECF No. 15-8 at 13–14.

This "fight" is the same factual basis Petitioner relied on to support his argument that he was acting in self-defense, Lodgment No. 2 (Rep.'s Appeal Tr. vol. 8), ECF No.

3:17-cv-02572-GPC-JLB

15-9 at 95–96.  Petitioner testified that on the day of the murder, when he opened the master bedroom to put some clean laundry on the bed, a short while later Mario turned and confronted him with a barbecue fork and sword in his hands.  Lodgment No. 2 (Rep.'s Appeal Tr. vol. 6), ECF No. 15-7 at 110–12.  At that point, according to Petitioner, Mario began screaming at him and advanced on him with the weapons, after which Petitioner "just went blank from there," "tuned everything out," and "closed [his] eyes and went straight toward [Mario]."  *Id.* at 112.  The two began to struggle, falling to the ground.  *Id.* at 115.  And at that point, Petitioner claimed he was "fighting for [his] life" but "[did not] remember every last little detail."  *Id.*  Finally, Petitioner testified there was also a struggle for the control of the sword—while Petitioner could not remember the exact details, he admitted that he "poke[d]" Mario with the sword in the process, and in Petitioner's own words, "I feel I did get the best of him."  *Id.* at 122–23.  Accordingly, defense counsel asked the trial court judge to give instructions on both self-defense (CALCRIM No. 505, "Justifiable Homicide: Self-Defense or Defense of Another") and imperfect self-defense (CALCRIM No. 571, "Voluntary Manslaughter: Imperfect Self-Defense or Imperfect Defense of Another—Lesser Included Offense"), and the court agreed to do so.  Lodgment No. 1, ECF No. 15-1 at 197–99.

Thus, as the state appellate court noted (and which the Magistrate Judge's R&R acknowledged as well), if the jury believed Petitioner's testimony about the "fight," they would have either acquitted him under the self-defense instructions or convicted him of voluntary manslaughter under an imperfect self-defense theory.  The self-defense and imperfect self-defense instructions state that it is the People's burden to prove that Petitioner did not commit a justifiable homicide or kill Mario with an actual but unreasonable belief in the need to defend himself.  *Id.*  The jury's finding against Petitioner means that the prosecution had proved beyond a reasonable doubt that Petitioner neither committed a justifiable homicide nor killed Mario with an actual (but

unreasonable) belief in the need to defend himself.  This finding also means that the jury did not believe Petitioner's version of events, which is the necessary factual basis to support the claim that Petitioner was provoked or under heat of passion.  Given these factual findings by the jury, it was reasonable for the state appellate court to determine that the jury would not have concluded Petitioner killed Mario "because of a sudden quarrel or in the heat of passion" had that instruction been given, *id.* at 151–52 (CALCRIM Nos. 570 and 522), making the instructional error harmless beyond a reasonable doubt.

The jury's findings functionally answer Petitioner's argument made in his Objection to the R&R.  While Petitioner re-asserts that with the proper instruction the jury could have convicted him of voluntary manslaughter or second-degree murder, ECF No. 21 at 2, the jury's findings on self-defense and imperfect self-defense against Petitioner make it reasonable for the state appellate court to determine that the lack of instruction was a harmless error.  These findings provide enough justification for the state appellate court to conclude that the jury rejected Petitioner's account of what happened in the "fight."  And if the jury disbelieved Petitioner's account of the fight, the source of Petitioner's provocation and heat of passion, it is reasonable for the state appellate court to determine that the same jury would also disbelieve that Petitioner was provoked or under the heat of passion.

**B.    Jury's Finding on First-Degree Murder and Its Implication on Provocation and Heat of Passion**

Second, it was not unreasonable for the state appellate court to determine that the jury's finding on first-degree murder against Petitioner eliminated the need for a jury instruction on provocation and heat of passion.  The first-degree murder instructions told the jury: "A decision to kill made rashly, impulsively, or without careful consideration is

1   not deliberate and premeditated."[4]  Lodgment No. 1, ECF No. 15-1 at 194.  Furthermore,

2   the instructions informed the jury that "The People have the burden of proving beyond a

3   reasonable doubt that the killing was first degree murder rather than a lesser crime.  If the

4   People have not met this burden, you must find the defendant not guilty of first degree

5   murder and the murder is second degree murder."  *Id.* at 196.  Thus, in order for the jury

6   to have convicted Petitioner of first-degree murder, they had to conclude beyond a

7   reasonable doubt that he did not decide to kill Mario "rashly, impulsively, or without

8   careful consideration," but rather that he "carefully weighed the considerations for and

9   against his choice and, knowing the consequences, decided to kill."  *Id.* at 194.

10       In his Objection to the R&R, Petitioner argued that the incident was not

11   premeditated and further investigation is required based on several "fact[s]"[5]: (1)

12   Petitioner's mother hid the samurai swords from the living room to underneath her

13   mattress; (2) Petitioner's mother sometimes locked her bedroom at night; (3) Petitioner

14   had never seen the particular carving fork, even though he grilled food on the barbecue

15   almost every day; and (4) Petitioner knew about the samurai swords, but had never seen

16   them once they were no longer in the living room.  ECF No. 21 at 3.  The jury already

17   heard all these claims, *see* ECF No. 15-13 at 4, 11 n.4, yet still concluded that the murder

18   was premeditated.  The fact that the jury considered the same factual presentations yet

19   reached a conclusion different from Petitioner's proves there was sufficient justification

---

[4] In fact, the prosecution mentioned in his closing argument (and the state appellate court properly noted so) that the instruction on first-degree murder is not consistent with heat of passion, i.e., if Petitioner underwent heat of passion, he could not have committed first-degree murder.  Lodgment No. 6, ECF No. 15-13 at 26.

[5] The Court notes that these are not "facts," but rather testimonies.  The first two come from the prosecution's case, ECF No. 15-13 at 4, and the last two come from the defense's case, *id.* at 11 n.4.

3:17-cv-02572-GPC-JLB

for the state appellate court to rule the way it did.  At the very least, the Court cannot say that the state court's decision was "so lacking in justification" to the point where no fair-minded jurist would disagree that the state court erred, which is the standard the Court must follow in resolving this dispute.  *Davis v. Ayala*, 576 U.S. 257, 269–70 (2015).

Given the jury finding on deliberate and premeditated murder, the state appellate court reasonably concluded that the jury would not have found heat of passion murder even if they had been properly instructed, and that the instructional error was therefore harmless beyond a reasonable doubt.

*         *         *

For the reasons described above, the state court's denial of Petitioner's claim based on jury instruction error was neither contrary to, nor an unreasonable application of, clearly established Supreme Court law.  28 U.S.C. § 2254(d)(1).  In addition, the denial was not based on an unreasonable determination of facts.  *Id.* § 2254(d)(2).  Therefore, Petitioner is not entitled to relief as to Claims One and Three of his Petition.

Accordingly, regarding the first and third grounds for relief in the Petition, the Court **ADOPTS** the Magistrate Judge's second Report and Recommendation, **OVERRULES** Petitioner's Objection to the R&R, and **DENIES** the relief.

## III.    Sufficiency of the Evidence of Torture (Petition's Claim Two)

Petitioner also argued that there was insufficient evidence presented to support his conviction for torture.  Petition, ECF No. 1 at 7.  The Magistrate Judge's R&R concluded that Petitioner is not entitled to relief for this claim.  ECF No. 20 at 29.  Petitioner's Objection to the R&R re-stated that there was "insufficient evidence to support his conviction for torture," but provided no additional argument backing the statement.  ECF No. 21 at 2.

The Due Process Clause of the Constitution guarantees defendants the right to be convicted only upon proof of every element of a crime beyond a reasonable doubt.  *Juan*

3:17-cv-02572-GPC-JLB

*H. Allen*, 408 F.3d 1262, 1274 (9th Cir. 2005) (citations omitted).  However, concerning federal habeas corpus review of a conviction on sufficiency of evidence grounds, a petitioner "faces a heavy burden" to establish a due process violation.  *Id.*  The Ninth Circuit has described a petitioner's burden as follows:

> First, he must meet the burden under *Jackson v. Virginia* of showing that "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  Second, after the passage of the Antiterrorism and Effective Death Penalty Act of 1996, the standards of *Jackson* are applied "with an additional layer of deference," requiring the federal court to determine "whether the decision of the [state court] reflected an 'unreasonable application of' *Jackson* . . . to the facts of this case."

*Maquiz v. Hedgpeth*, 907 F.3d 1212, 1217 (9th Cir. 2018) (ellipses in original) (internal citations omitted) (first quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original); then quoting *Juan H.*, 408 F.3d at 1274–75).  A federal habeas court must be "mindful of the deference owed to the trier of fact and, correspondingly, the sharply limited nature of constitutional sufficiency review."  *Juan H.*, 408 F.3d at 1275 (quotations omitted).

To review Petitioner's insufficient evidence claim, the Court looks at the elements of the offense under state law.  *Maquiz*, 907 F.3d at 1218; *see also Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) ("We have repeatedly held that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus.").  California courts have defined the crime of torture, for purposes of Penal Code Section 206, as consisting of two elements: "(1) the infliction of great bodily injury; and (2) the specific intent to cause cruel or extreme pain and suffering for the purpose of revenge, extortion, persuasion, or for any sadistic purpose."  *People v. Massie*, 142 Cal. App. 4th 365, 370–71 (2006).

Petitioner argued that there was insufficient evidence for each element in his appeal filed in the California Court of Appeal for the Fourth Appellate District and in his

petition for review filed in the California Supreme Court.  Lodgment Nos. 4 and 7, ECF Nos. 15-11 and 15-14.  The California Supreme Court denied the petition for review without citation of authority.  Lodgment No. 8, ECF No. 15-15.  The state appellate court concluded that sufficient evidence was provided for each element of the crime. Specifically, the court wrote:

> Viewing the record in the light most favorable to the judgment (*Harris*, *supra*, 57 Cal.4th at p. 849), we conclude substantial evidence supports defendant's torture conviction.  There is little question defendant inflicted great bodily injury on Mario.  (See *Hale*, *supra*, 75 Cal.App.4th at p. 108 [" 'Abrasions, lacerations and bruising can constitute great bodily injury.' "].)  Defendant inflicted bruises, 12 puncture wounds, 10 incised wounds, and 16 stab wounds.  The stab wounds injured many of Mario's vital organs.  Thus, substantial evidence supports the first element of torture.

> Substantial evidence also supports the second element of torture—that defendant intended to cause Mario cruel or extreme pain and suffering for the purpose of revenge.  Regarding intent, the record supports a reasonable inference that defendant attacked Mario when he was vulnerable, lying face down in his bed.  (See *Hale*, *supra*, 75 Cal.App.4th at p. 106 [the fact that attack began while victim was asleep and continued after defendant awoke screaming supported inference that defendant intended to cause cruel physical pain].)  Dr. Wagner opined (and defendant concedes on appeal) the first 12 wounds were inflicted on Mario's neck, face, shoulder, and back with the carving fork.  Those wounds were not "particularly deep" or life-threatening, but would "[h]urt, probably, for sure."

> The next wounds were the 10 nonfatal incised wounds defendant inflicted under Mario's chin, and on his cheeks, ear, scalp, and forearm. Defendant then inflicted 11 nonfatal stab wounds and five fatal ones.

> Dr. Wagner testified all the wounds were inflicted while Mario was alive and would have caused him "pretty extreme pain" for the not-insubstantial 10 to 20 minutes it would have taken him to bleed to death. That Mario was in such pain would have been obvious to defendant.  Mario screamed—in "a very painful voice"—"Help, help.  Why are you doing this to me?"  He screamed so loudly that a neighbor heard him in her closed condo over the sound of her television.  Leon also heard the distinctive

26

screaming despite his hearing difficulties.  Yet defendant continued attacking despite Mario's distressed screams.

The fact that defendant inflicted so many nonfatal—yet "extreme[ly] pain[ful]— wounds when he had available the lethal samurai sword supports the reasonable inference that defendant intended to inflict cruel or extreme pain and suffering before finally delivering the coup de grâce.

Substantial evidence also supports the jury's finding that defendant's motive was revenge.  Defendant admitted his relationship with Mario became distant after the second December incident, and that he was upset with Mario after defendant was arrested in January—after which the brothers had "absolutely no communication" and never reconciled. Defendant acknowledged he felt like he "was treated like just somebody that wasn't part of the family."  And he described Mario as the "little enforcer" who was "just creeping over [defendant's] shoulder 24/7."  Minerva testified defendant told her he was upset because "he thought that [she] was picking Mario over him."  All of this evidence supports the reasonable inference that defendant's attack on Mario was motivated by revenge.

In sum, substantial evidence supports defendant's conviction for torture under section 206.

Lodgment No. 6, ECF No. 15-13 at 29–31.

The Court finds that the state appellate court reasonably applied the standard laid out in *Jackson v. Virginia* to the facts of the case.  First, the state appellate court's analysis and conclusion over the first element of the crime of torture was reasonable.  The state appellate court correctly found that Petitioner "inflicted bruises, 12 puncture wounds, 10 incised wounds, and 16 stab wounds."  *Id.* at 29.  Regarding the term "great bodily injury" in the Penal Code, "[a]brasions, lacerations, and bruising can constitute great bodily injury."  *People v. Jung*, 71 Cal. App. 4th 1036, 1042 (1999) (citation omitted).

Second, the state appellate court's analysis and conclusion over the second element of the crime of torture was also reasonable.  Here, there are two sub-components, "the

3:17-cv-02572-GPC-JLB

specific intent to cause cruel or extreme pain and suffering" and "for the purpose of revenge, extortion, persuasion, or for any sadistic purpose," and the state appellate court reasonably addressed both.

The state appellate court's analysis and conclusion on "the specific intent to cause cruel or extreme pain and suffering" was reasonable.  Dr. Glenn Wager, the medical examiner who conducted Mario's autopsy, testified the following:

> Once the paper bags had been removed and photographs taken both by police and by medical examiner staff, the injuries noted was extensive bruising of the face and scalp, more right-sided than left, particularly on the face.
>
> There were incised or long cuts, if you will, on the scalp, under the chin, forehead on the left side, and cheek.  On the front side of the body, characteristic -- what looked like puncture marks on the neck, as well as some bruising, particularly on the right side.
>
> There were five deep stab wounds to the upper right chest: four on the chest itself and one in the upper arm, extending into the armpit.  There was a stab wound of the abdomen, some superficial injuries on the right hand, looked like puncture marks.
>
> Deep but incised wounds of the left arm, with a large gaping wound in the forearm, a very superficial, linear incised wound on the inside of the forearm, and then injuries on the hand.  No injuries to the legs.  No injuries to the genitalia or pelvis.
>
> On the back side, there were a series of, essentially, puncture wounds over the left shoulder, right shoulder, and back.  Those predominantly on the left shoulder and back are patterned, which suggested one type of instrument, whereas those on the right side, for the most part, are stab wounds for the same type of characteristics as seen on the front.
>
> The lower back showed extensive bruising related to body movement and the settling of blood from the injuries.

Lodgment No. 2 (Rep.'s Appeal Tr. vol. 5), ECF No. 15-6 at 18–19.

28

Mario suffered three types of wounds: (1) bruises and abrasions which were likely caused by punching; (2) puncture wounds which were likely caused by the barbecue fork; and (3) deep stab wounds which were likely caused by the samurai sword. *See id.* at 40–46. Dr. Wagner testified that all the wounds were inflicted while Mario was alive. *Id.* at 63. Dr. Wagner concluded that the abrasions and puncture wounds caused by the barbecue fork were inflicted first because the deep samurai sword wounds would have been fatal:

> If you start with a person who is prone and getting punched, probably. My thought process is it goes from punch to fork to sword. I suppose it could go another way, but we just know that the sword injuries are fatal. Whatever started this probably started as a punching thing, and then somewhere along the line, a fork was introduced.
>
> And there are fork injuries that move over the shoulders to the neck, to the face, if that is, in fact, the right hand. But the bulk of those puncture marks appear to me to go from a left to a right position, which suggests to me he is raising up and turning.
>
> That still allows for the left arm and left side to be put into some type of defensive posturing with whatever results. Because there's active motion, it also means that those incised wounds are going to be primarily superficial, which they are.
>
> At some point, though, he gets skewered, and he's not moving anymore.

*Id.* at 91–92.

Dr. Wagner testified that Mario had multiple puncture wounds at various parts of the body from the barbecue fork. *Id.* at 40. The fork had been used with such force that its tines were bent, likely from impact with Mario's rib cage and spine. *Id.* at 41.

In addition, the deep, fatal stab wounds were inflicted by the samurai sword. *Id.* at 42. Two of the stab wounds were "incised," meaning that the sword had been stabbed far enough into Mario's body that the hilt of the sword had caused abrasions to his skin, and

Petitioner would have had to twist it to remove it from Mario's body.  *Id.* at 42–43, 59.  These two wounds were also "through and through" Mario's body, and thus were likely the wounds that resulted in the sword being bent by the force of traveling through Mario's body and hitting the subfloor beneath him.  *Id.* at 43.  The stab wounds punctured both of Mario's lungs, cut the top part of his heart and aorta, and injured his trachea, esophagus, kidney, and spleen.  *Id.* at 44–45, 52.  The injuries to Mario's lungs collapsed them, making it impossible for him to breathe.  *Id.* at 46.

In sum, Dr. Wagner testified that the injuries inflicted on Mario would have caused "pretty extreme pain," and it would have taken ten to twenty minutes for him to bleed to death, during which time he would have been in pain.  *Id.* at 63–66.  The order in which the wounds were inflicted (punching and non-fatal but deep puncture wounds inflicted first) and the intensity with which they were inflicted (where both the barbecue fork and the samurai sword were bent, and the sword had to be twisted to remove it from Mario's body) support the state court's conclusion that Petitioner intended to inflict cruel or extreme pain.  *See Maquiz v. Hedgpeth*, 907 F.3d 1212, 1217 (9th Cir. 2018).

The state appellate court's analysis and conclusion on "for the purpose of revenge, extortion, persuasion, or for any sadistic purpose" was also reasonable.  Petitioner's mother, Minerva, testified that when Petitioner was thirteen or fourteen years old, she moved from San Diego to Seattle and took all her children except Petitioner with her.  Lodgment No. 2 (Rep.'s Appeal Tr. vol. 3), ECF No. 15-4 at 68–69.  Petitioner lived with his father in San Diego until Minerva and her other children returned to San Diego ten years later.  *Id.* at 69.

Petitioner eventually moved in with Minerva and Mario, *id.* at 69–70, and tensions escalated in the household over Petitioner's behavior and alcohol and drug use, *id.* at 82–84.  Police were called to the residence three times before the murder.  *See* Lodgment No. 2 (Rep.'s Appeal Tr. vol. 4), ECF No. 15-5 at 38.  Minerva testified that during one of the

incidents, Mario sat on Petitioner until the police arrived, where Petitioner "was very upset." *Id.* at 44–45. Petitioner was arrested, and when he returned home he was upset with Minerva and Mario. *Id.* at 48–49. Petitioner told Minerva he thought she was favoring Mario over him, *id.* at 54, and Petitioner stopped calling her "mom" in the months leading up to the murder, Lodgment No. 2 (Rep.'s Appeal Tr. vol. 3), ECF No. 15-4 at 93. According to Minerva, Petitioner and Mario never reconciled. *Id.* at 92–93.

Similarly, Petitioner himself testified that when he returned home after being arrested, he was upset and "felt like I was treated like just somebody that wasn't part of the family." Lodgment No. 2 (Rep.'s Appeal Tr. vol. 6), ECF No. 15-7 at 83. Further, Petitioner viewed Mario as wanting to be a "little enforcer," and felt that Mario "would, like, sit there and, like, look at me and, you know, like -- like, I felt somebody just creeping over my shoulder 24/7 . . . ." *Id.* at 85. Taken collectively, the evidence was sufficient to support a determination that Petitioner intended to inflict cruel or extreme pain on Mario for the purpose of revenge.

In conclusion, the state court's application of *Jackson v. Virginia*, 443 U.S. 307 (1979) was neither contrary to, nor an unreasonable application of, clearly established Supreme Court law. Petitioner's conclusory objection otherwise is unpersuasive given the discussion above. Therefore, regarding the second ground for relief in the Petition, the Court **ADOPTS** the Magistrate Judge's second Report and Recommendation, **OVERRULES** Petitioner's Objection to the R&R, and **DENIES** the relief.

## IV. Evidentiary Hearing

While Petitioner never requested an evidentiary hearing,[6] the Magistrate Judge's R&R addressed Respondent's argument that Petitioner is not entitled to one. ECF No. 20

---

[6] Petitioner's Objection states that "further investigation is required," but there is no reference to a hearing, and the statement is made to support the argument that "this

at 29–30.  The Court agrees with the Magistrate Judge's analysis and conclusion that Petitioner is not entitled to an evidentiary hearing.  AEDPA "substantially restricts the district court's discretion to grant an evidentiary hearing."  *Baja v. Ducharme*, 187 F.3d 1075, 1077 (9th Cir. 1999).  Section 2254(e)(2) of AEDPA controls:

> (2) If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that-
>
>> (A) the claim relies on-
>>
>>> (i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
>>>
>>> (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and
>>
>> (B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

28 U.S.C. § 2254(e)(2).

To grant an evidentiary hearing, the court must first "determine whether a factual basis exists in the record to support the petitioner's claim."  *Insyxiengmay v. Morgan*, 403 F.3d 657, 669 (9th Cir. 2005) (quoting *Baja*, 187 F.3d at 1078).  If Petitioner's issues can be resolved by the state court record, no evidentiary hearing is required.  *See Cullen v. Pinholster*, 563 U.S. 170, 183 (2011).  If not, the court must "ascertain whether the petitioner has 'failed to develop the factual basis of the claim in State court.'"  *Insyxiengmay*, 403 F.3d at 669–70.  A failure to develop the factual basis of a claim in

---

incident was not premeditated."  ECF No. 21 at 3.  The Court has already addressed Petitioner's arguments on premeditation and first-degree murder.

state court implies "lack of diligence, or some greater fault, attributable to the prisoner or the prisoner's counsel." *Williams v. Taylor*, 529 U.S. 420, 432 (2000).  "Diligence will require in the usual case that the prisoner, at a minimum, seek an evidentiary hearing in state court in the manner prescribed by state law." *Id.* at 437.  The previous discussion in this Court's Order demonstrates that Petitioner's claims can be resolved by reference to the state court record.  Moreover, Petitioner did not seek an evidentiary hearing in state court.  *See* Lodgment Nos. 4, 7, ECF Nos. 15-11, 15-14 (Petitioner's appeal and petition for review in the state courts).

Further, the Supreme Court in *Pinholster* held that where habeas claims have been decided on their merits in state court, a federal court's review must be confined to the record that was before the state court.  563 U.S. at 181–82.  Petitioner can only proceed to develop additional evidence in federal court if either Section 2254(d)(1) or (d)(2) is first satisfied.  *See Sully v. Ayers*, 725 F.3d 1057, 1076 (9th Cir. 2013) (citing *Pinholster*, 563 U.S. at 203 n.20) (stating that "an evidentiary hearing is pointless once the district court has determined that § 2254(d) precludes habeas relief").

For the reasons discussed in this Section, the Court **ADOPTS** the Magistrate Judge's second Report and Recommendation in determining that Petitioner is not entitled to an evidentiary hearing.

## <u>CERTIFICATE OF APPEALABILITY</u>

Rule 11 of the Rules Governing Section 2254 Cases in the United States District Courts states: "The district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant."  A certificate of appealability should be issued "only if the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  The Court should issue the certificate of appealability "when the prisoner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right

and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling."  *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

For the reasons provided in the Discussion, the Court concludes that Petitioner has not made a substantial showing of the denial of a constitutional right, and that jurists of reason would not find it debatable whether the district court was correct in its procedural ruling.  Accordingly, the Court **DENIES** a certificate of appealability.

<u>**CONCLUSION**</u>

The Court **ADOPTS** the Magistrate Judge's Reports and Recommendations in their entirety, **OVERRULES** Petitioner's Objection to the second Report and Recommendation, **DENIES** Petitioner's Petition for Writ of Habeas Corpus, and **DENIES** a certificate of appealability.

**IT IS SO ORDERED.**

Dated:  October 21, 2020

Hon. Gonzalo P. Curiel
United States District Judge

34

3:17-cv-02572-GPC-JLB